**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**PEDRO ROJAS, HEDIBERTO RAMIREZ PEREZ, MARIBEL LOPEZ MARTINEZ,** and **ARGENTINA JUAREZ-LOPEZ,** on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**ANDREW McCOY**, Special Agent, Homeland Security Investigations, in his individual capacity; **LINDSEY VALENTINO**, Special Agent, Homeland Security Investigations, in her individual capacity; **MICHAEL DONNELL**, Deportation Officer, Immigration and Customs Enforcement, in his individual capacity**; JAKE MATTHEW BELL,** Agent, Homeland Security Investigations, in his individual capacity; **JASON BURRELL**, Agent, United States Border Patrol, in his individual capacity; **FOSTER RUBINSTEIN**, Agent, United States Border Patrol, in his individual capacity; **J. DI BELLA**, Agent, United States Border Patrol, in his individual capacity; **IAN BROCKWAY**, Agent, United States Border Patrol, in his individual capacity; **DENNIS LAST NAME UNKNOWN**, Agent, United States Border Patrol, in his individual capacity; **BRANDON GEER**, Deportation Officer, Immigration and Customs Enforcement, in his individual capacity**; DON HILTON**, Sheriff, Oswego County, in his individual capacity; **BRIAN SCHENCK**, Sheriff, Cayuga County, in his individual capacity; **EDGAR LORENZO**, Agent, United States Border Patrol, in his individual

**<u>CLASS ACTION COMPLAINT</u>**

**JURY DEMAND**

Civil Action No. 5:26-CV-1716 (ECC/ML)

| |
|---|
| capacity; **JAVIER LORENZO**, Agent, United States Border Patrol, in his individual capacity; **DANIEL HUTCHINGS**, Agent, United States Border Patrol, in his individual capacity; **CHARLIE RODRIGUEZ**, Agent, United States Border Patrol, in his individual capacity; **NICHOLAS MULZOFF**, Agent, United States Border Patrol, in his individual capacity; **REGAN D.,** Agent, Homeland Security Investigations, in her individual capacity; **AGENTS DOE 1-60,** Officers, United States Border Patrol, Homeland Security Investigations, Immigration and Customs Enforcement, Internal Revenue Service, Cayuga County Sheriff's Office, and Oswego County Sheriff's Office**;** **MARKWAYNE MULLIN**, Secretary of the Department of Homeland Security, in his official capacity; **DAVID VENTURELLA**, Acting Director of Immigration and Customs Enforcement, in his official capacity; **THOMAS BROPHY**, Director of Enforcement and Removal Operations for the Buffalo Field Office of Immigration and Customs Enforcement, in his official capacity; and **JAMES D'AMATO**, Chief Patrol Agent, United States Border Patrol, Buffalo Sector, in his official capacity;<br><br>Defendants. |

## PRELIMINARY STATEMENT

1. On the morning of September 4, 2025, approximately 60 federal and local law enforcement agents—wearing military-style body armor; carrying visible firearms and zip-ties; and backed by dogs, a helicopter, and ATVs—descended on Nutrition Bar Confectioners, Inc. ("NBC"), a snack bar factory in Cato, New York. They were not looking for drugs, weapons, or

people suspected of committing violent crimes. They were there to unlawfully apprehend Latino workers en masse.

2. The agents arrived ostensibly to execute two search warrants. The first permitted agents to search for records related to alleged unlawful employment practices and document fraud. The second authorized agents to enter NBC facilities and engage in consensual questioning of NBC employees to potentially find noncitizens unlawfully present in the United States. The government did not request permission to seize any person for any reason, nor did either warrant provide such authority. Instead, the government represented to a magistrate judge that—absent individualized suspicion of either criminal activity or unlawful presence—agents would only engage in "systematic consensual questioning" of workers while they executed the warrants on the NBC premises. But as a court later found, agents did "the exact opposite of what the Government told the magistrate judge they would do." *United States v. Juarez-Lopez*, 813 F. Supp. 3d 326, 340 (N.D.N.Y. 2025).

3. That morning, September 4, local and federal agents unleashed a large-scale operation to seize workers for *non-consensual* questioning—exceeding their authority under the warrants and contradicting the government's representations to the court. Agents on all-terrain vehicles ("ATVs") surrounded the NBC property as others guarded the roads and doors leading into and out of the factory while a helicopter circled overhead and K-9 units searched the premises. Agents in tactical gear—many wearing body armor, face coverings, military-style fatigues, and visible firearms; some carrying long guns; and others displaying clutches of zip-ties—flooded into the building from multiple entrances. They swept the building room by room, ordering workers to the breakroom, and stationed armed agents at every exit. Male agents even entered women's bathrooms to seize women inside. Agents performed additional sweeps to ensure that every Latino

employee—U.S. citizens and noncitizens alike, *regardless* of immigration status—was seized and then subjected to non-consensual questioning about their immigration status, in violation of the terms of the warrants.

4. Instead of "approaching and consensually questioning employees" at NBC, "agents (without individualized suspicion) initially and briefly seized all employees" inside the factory and then "directed employees to self-identify as citizens or non-citizens authorized to work," and then "directed those who did not self-identify to approach them for interviews." *Juarez-Lopez*, 813 F. Supp. 3d at 340. While agents inside rounded up workers, agents in the parking lot seized the Latino workers they encountered, while leaving white employees undisturbed. Agents did not detain or question any white employees encountered in the parking lot; they simply told the white workers that the factory was closed for the day and sent them home. Every Latino person in the parking lot, by contrast, was detained and questioned. This disparate treatment was not happenstance.

5. By the end of the dragnet, agents had seized at least one hundred U.S. citizens and noncitizens for non-consensual questioning without any individualized suspicion and arrested fifty-seven of those individuals. Some arrests were based solely on the individual's invocation of the right to counsel or the right to remain silent. In at least one documented instance (and there are likely others), an employee merely invoked her right to counsel, yet agents included false statements on official forms, claiming that she "freely" admitted to being in the country illegally. For that same individual, an agent untruthfully stated in a subsequent sworn criminal complaint that agents had determined her immigration status "[w]hile-on-scene" at the NBC facility, which was objectively not true. *Juarez-Lopez*, 813 F. Supp. 3d at 338, 345-46.

6. The search for company records and the execution of the Rule 41 warrant did not even meaningfully begin until after the mass seizure was complete, contrary to representations made to the issuing magistrate judge that the document search would be conducted concurrently with the consensual questioning of the employees.

7. The agents knew they were exceeding the warrants' authority. As captured on body camera footage, an agent from Homeland Security Investigations admitted that the Rule 41 warrant was a pretextual tool, stating that worksite operations "almost need[ ] a criminal aspect to it" because "[t]hat's the only way you're gonna get anything approved."

8. Body camera footage confirmed the agents' true mission: Seize and arrest as many Latino workers as possible. At approximately 9:22 a.m.—less than five minutes before agents entered the factory and before any NBC workers had been questioned, let alone arrested—a white NBC employee approached three white agents in the parking lot and asked about a colleague named "Steve" who was inside. The agents asked what Steve looked like. The employee replied: "he's a white guy." The agents made clear that a white person inside the facility wouldn't have any problems during the operation and one agent expressly stated, "that's kind of the point." The agents and the white worker laughed and the white worker said, "that's what I figured." The agents did not ask Steve's last name or immigration status. And even though there was ostensibly a criminal investigation ongoing at the factory, the agents were only interested in what Steve looked like, as race and ethnicity were determinative factors in this operation. These remarks make clear that the dragnet was targeted at seizing and arresting Latino workers.

9. And these agents' remarks were prescient. Over one year later, no criminal charges or indictments have been filed against NBC or any of its white owners or employees for any alleged crimes related to either warrant, revealing the pretextual nature of the September 4, 2025, operation.

10. Other agents' remarks further exposed the dragnet's racial animus and targeting of only Latino workers. One agent denigrated Latin American immigrants on camera, referring to them as "animals" unworthy of humane treatment. He expressed his "concern" that Latino immigrants come "into our communities" where "we treat our children differently in this country." He referred to Latin American children as young as nine years old as "kingpin[s]" and "literal street rats" who are treated like "animal[s]" and commodities by their families and who will "eat our kids for breakfast." These comments were met with laughter and agreement from the federal and local agents patrolling the premises with him. Elsewhere in the parking lot during the operation, a federal agent announced to several others, "I just wet down seventy-four fucking Guatemalans." This comment was also met with laughter by surrounding agents.

11. In the immediate aftermath of the NBC dragnet, families were torn apart, children were separated from their parents, and communities were shattered. Officers arrested more than twenty parents—including mothers of toddlers and infants—without ensuring care for their children. When one mother asked to make a phone call to arrange for someone to pick up her son, an officer denied her request and suggested the child would find his own way home. One woman explained that she was pregnant but was arrested anyway, in flagrant violation of an ICE directive to refrain from doing so absent exceptional circumstances. Workers were zip-tied, loaded into transport vans, and rushed to detention facilities. Some workers were quickly whisked out of the state, placed on planes, and summarily deported without final orders of removal or accepting voluntary departure—all before they had any opportunity to speak to a lawyer, challenge their detention, or say goodbye to their families. Others spent months in immigration detention in Texas and Louisiana under abhorrent conditions, even experiencing medical neglect, and eventually were forced to leave the country and their families.

12. The dragnet at NBC was planned, agreed upon, coordinated, and executed by agents from Homeland Security Investigations ("HSI"), Immigration and Customs Enforcement ("ICE"), United States Border Patrol ("USBP"), the Internal Revenue Service ("IRS"), the U.S. Marshals Service ("USMS"), and from two local law enforcement agencies—the Oswego County Sheriff's Office ("OCSO") and the Cayuga County Sheriff's Office ("CCSO"). On information and belief, the dragnet at NBC was planned, reviewed, approved, and directed by senior federal officials in Washington, D.C.

13. Plaintiffs are four Latino employees of NBC who were each detained during the mass suspicion-less seizure of workers. Pedro Rojas is a U.S. citizen, born in Puerto Rico, who was forced to produce identification and undergo questioning before being allowed to leave his workplace. Hediberto "Eddie" Ramirez Perez had a valid work authorization card, which indicated that he had a pending cancellation-of-removal appeal before the Board of Immigration Appeals; nonetheless, he was arrested, denied access to counsel, and unlawfully deported to Guatemala within 72 hours—where he remains today, separated from his U.S. citizen wife and two young sons. Maribel Lopez Martinez had a valid work authorization card and a pending asylum appeal; she was unlawfully arrested, deported, and separated from her two-year-old son—who had celebrated his second birthday the day before the raid—for nearly six months. Argentina Juarez-Lopez was arrested after she did no more than ask to speak to a lawyer and was subsequently subjected to criminal charges based on materially false misrepresentations by agents about the circumstances of her arrest in both an I-213 form related to the initial encounter and a sworn criminal complaint.

14. Through this action, Plaintiffs seek to hold accountable the federal and local agents who conspired to execute a racial dragnet against Latino NBC workers. Plaintiffs seek a

declaratory judgment that the operation violated Section 1985(3) and the Fourth Amendment to the U.S. Constitution, as well as monetary damages for these violations. The named Plaintiffs seek to represent the class of approximately one hundred individuals working at NBC on the morning of September 4, 2025, who were subject to a suspicion-less seizure and non-consensual questioning about their immigration status.

15. Ms. Lopez Martinez, Ms. Juarez-Lopez, and Mr. Ramirez Perez also bring individual claims for their false arrest and wrongful detention under the Fourth and Fifth Amendments, respectively. Mr. Ramirez Perez brings further claims under the Administrative Procedure Act, the Due Process Clause of the Fifth Amendment, and the Fourth Amendment seeking an order facilitating his return to this judicial district so that he can be reunited with his family and effectively pursue his cancellation of removal application from within the United States.

## PARTIES

**Plaintiffs**

16. Plaintiff Pedro Rojas is a United States citizen, born in Puerto Rico. Mr. Rojas is Latino, and Spanish is his first language. He resides in New York, where much of his family lives, and is the primary caregiver for his mother. He has worked at NBC for over 4 years and continues to work there today. In spite of his citizenship, Mr. Rojas was subject to a suspicion-less seizure and non-consensual questioning by immigration agents.

17. Plaintiff Eddie Ramirez Perez has been married for over a decade to Elizabeth ("Liz") Ramirez-Abrams, a U.S. citizen, with whom he has two minor children who are also both U.S. citizens. Mr. Ramirez Perez was born in Guatemala and came to the United States more than twenty years ago. At the time of the September 4, 2025 dragnet, Mr. Ramirez Perez had a valid, unexpired Employment Authorization Document ("EAD") and a pending appeal of his

cancellation-of-removal application before the Board of Immigration Appeals ("BIA"), which prohibited his deportation. Nevertheless, he was subjected to a suspicion-less seizure, unlawful arrest, wrongful detention, and illegal deportation. His appeal was pending with the Board of Immigration Appeals ("BIA") at that time and remains pending today. Eddie, Liz, and their two children reside in Martville, New York; however, Mr. Ramirez Perez is presently located in Guatemala, where he was wrongfully deported.

18. Plaintiff Maribel Lopez Martinez is a Guatemalan national who had a valid, unexpired EAD and an open asylum appeal before the BIA at the time she was subjected to Defendants' suspicion-less seizure, unlawful arrest, wrongful detention, and illegal deportation—which the government subsequently conceded was in error. Ms. Lopez Martinez came to the United States in 2018, fleeing brutal abuse from which the Guatemalan government would not protect her, and filed a timely asylum claim. Ms. Lopez Martinez is the mother of a U.S. citizen two-year old from whom she was separated for nearly six months after her arrest as he remained in the United States while she was detained in various facilities and erroneously deported to Guatemala.

19. Plaintiff Argentina Juarez-Lopez is a Guatemalan national who was undocumented at the time she was subjected to a suspicion-less seizure, unlawful arrest, and wrongful detention. Before September 4, 2025, Ms. Juarez-Lopez's life in the United States consisted mainly of work and church activities. With her church community, Ms. Juarez-Lopez would pray for the sick and visit people in care facilities, organize sporting and anti-bullying activities for teenagers, and participate in a women's gathering to help support those dealing with the hardship of being far from home and family. The sight of armed, masked agents sweeping through the factory and

rounding up employees for forced questioning brought back traumatic memories of guerrilla fighters terrorizing her community during her childhood in Guatemala.

**Defendants in Their Individual Capacities**

20. Defendant Andrew McCoy was an HSI Special Agent at all times relevant to this action. He sponsored the applications for the search warrants for the NBC premises. He participated in planning and executing the mass suspicion-less seizure for non-consensual questioning of NBC employees, including Plaintiffs and putative class members, and directed aspects of the dragnet that caused Plaintiffs' wrongful arrests, detentions, deportations, and/or family separations. During the dragnet, Special Agent McCoy was inside the factory directing the suspicion-less seizure and non-consensual questioning of NBC workers, including directing agents under his command as to when seized U.S. citizens could be released after non-consensual questioning. He is being sued in his individual capacity.

21. Defendant Lindsey Valentino was an HSI Special Agent at all times relevant to this action. She participated in the planning and execution of the mass suspicion-less seizure for non-consensual questioning of NBC employees, including Plaintiffs and putative class members, and directed aspects of the dragnet that caused Plaintiffs' wrongful arrests, detentions, deportations, and/or family separations. During the dragnet, Special Agent Valentino was inside the factory directing and participating in the suspicion-less seizure and non-consensual questioning of NBC workers, including U.S. citizens and lawful permanent residents. She is being sued in her individual capacity.

22. Defendant Michael Donnell was an ICE Enforcement and Removal Operations ("ERO") Deportation Officer at all times relevant to this action. He participated in the planning and execution of the mass suspicion-less seizure for non-consensual questioning of NBC employees, including Plaintiffs, during the dragnet at NBC that caused Plaintiffs' wrongful arrests,

detentions, deportations, and family separations at issue. Agent Donnell was stationed in the parking lot with other agents during the dragnet, ensuring that Latino NBC workers did not leave the premises prior to their seizure, non-consensual questioning, and/or arrest. He is being sued in his individual capacity.

23. Defendant Jake Matthew Bell was an HSI Agent at all times relevant to this action. He participated in the planning and execution of the mass suspicion-less seizure for non-consensual questioning of NBC employees, including Plaintiffs, during the dragnet at NBC that caused Plaintiffs' wrongful arrests, detentions, deportations, and family separation. Among other activities during the dragnet, Agent Bell was involved in secondary sweeps of the NBC factory to ensure that all Latino workers had been herded into the breakroom for non-consensual questioning. He is being sued in his individual capacity.

24. Defendant Jason Burrell was a USBP Intelligence Officer at all times relevant to this action. He participated in the planning and execution of the mass suspicion-less seizure for non-consensual questioning of NBC employees, including Plaintiffs, during the dragnet at NBC that caused Plaintiffs' wrongful arrests, detentions, deportations, and family separations. Agent Burrell was involved in the initial sweep of the factory to seize NBC workers en masse, and he commanded NBC workers to go to the breakroom for non-consensual questioning. Agent Burrell further contributed to Ms. Lopez Martinez's wrongful arrest, detention, deportation, and family separation because he was given her EAD and social security card to scan for information, which would have shown that she was not removable. He is being sued in his individual capacity.

25. Defendant Foster Rubinstein was a USBP Agent at all times relevant to this action. He included false statements in an arrest report for Plaintiff Juarez-Lopez, who was detained during the dragnet at NBC. In Ms. Juarez-Lopez's arrest report, he falsely stated that she had freely

admitted her foreign nationality and lack of documents during the raid. In fact, her only statements to agents during the raid were to ask for a lawyer, as the government conceded in *USA v. Juarez Lopez*, the criminal proceeding against Ms. Juarez-Lopez. He is being sued in his individual capacity.

26. Defendant J. Di Bella was a USBP Agent at all times relevant to this action. He participated in the planning and execution of the mass suspicion-less seizure for non-consensual questioning of NBC employees, including Plaintiffs, during the dragnet at NBC that caused Plaintiffs' wrongful arrests, detentions, deportations, and family separations. Agent Di Bella personally subjected Plaintiffs Ramirez Perez and Juarez-Lopez, among other NBC workers, to unlawful non-consensual questioning that contributed to Mr. Ramirez Perez's and Ms. Juarez-Lopez's wrongful arrest, detention, deportation, and/or family separation. He is being sued in his individual capacity.

27. Defendant Ian Brockway was a USBP Agent at all times relevant to this action. He participated in the planning and execution of the mass suspicion-less seizure for non-consensual questioning of NBC employees, including Plaintiffs, during the dragnet at NBC that caused Plaintiffs' wrongful arrests, detentions, deportations, and family separations. Agent Brockway was personally engaged in the initial sweep of the factory to seize NBC workers en masse and command NBC workers to go to the breakroom for non-consensual questioning. In the breakroom, he was involved in restricting the movements of NBC workers, requiring them to identify themselves by citizenship, and subjecting them to further non-consensual questioning. He is being sued in his individual capacity.

28. Defendant Dennis, last name unknown, was a USBP Agent at all times relevant to this action. He participated in the planning and execution of the mass suspicion-less seizure for

non-consensual questioning of NBC employees, including Plaintiffs, during the dragnet at NBC that caused Plaintiffs' wrongful arrests, detentions, deportations, and family separations. Agent Dennis was stationed in the parking lot with other agents during the dragnet, ensuring that Latino NBC workers did not leave the premises prior to their seizure, non-consensual questioning, and/or arrest. He is being sued in his individual capacity.

29. Defendant Brandon Geer was an ICE ERO Deportation Officer at all times relevant to this action. He participated in the planning and execution of the mass suspicion-less seizure for non-consensual questioning of NBC employees, including Plaintiffs, during the dragnet at NBC that caused Plaintiffs' wrongful arrests, detentions, deportations, and family separations. Agent Geer was involved in the initial sweep of the NBC factory to seize workers en masse, and he commanded NBC workers to go to the breakroom for non-consensual questioning using NBC's intercom system. He is being sued in his individual capacity.

30. Defendant Regan D., last name unknown, was an HSI Agent at all times relevant to this action. She participated in the planning and execution of the mass suspicion-less seizure for non-consensual questioning of NBC employees, including Plaintiffs, during the dragnet at NBC that caused Plaintiffs' wrongful arrests, detentions, deportations, and family separations. During the dragnet, Agent Regan D. was both inside the factory and in the parking lot. She directed the suspicion-less seizure of Latino workers she encountered in the parking lot while leaving entirely at liberty similarly situated white workers she encountered in the parking lot. She also participated in the non-consensual questioning of NBC workers, including U.S. citizens and lawful permanent residents, inside the factory. She is being sued in her individual capacity.

31. Defendant Don Hilton is the Oswego County Sheriff and directs the members of the OCSO under his supervision and command. On information and belief, during or prior to

planning meetings for the September 4 dragnet at NBC, which were attended by members of OCSO, Defendant Hilton entered an agreement with agents from the federal agencies who also participated in this raid to have OCSO deputies under his command participate in the planning and execution of the NBC dragnet under the pretext of supporting a criminal investigation. Defendant Hilton entered the agreement with knowledge that the criminal search warrant for NBC was only for documents; the administrative search warrant permitted only consensual questioning; there were no arrest warrants for any individual at NBC; and that the agents' show of force, including the participation of OCSO, was intended to execute a mass seizure of Latino workers. Defendant Hilton authorized the use of OCSO deputies and vehicles to surround the NBC premises to prevent Latino workers from leaving the premises during the dragnet. Plaintiffs sue Defendant Hilton in his individual capacity.

32. Defendant Brian Schenck is the Cayuga County Sheriff and directs the members of CCSO under his supervision and command. On information and belief, during or prior to planning meetings for the September 4 dragnet at NBC, Defendant Schenck entered an agreement with agents from the federal agencies who also participated in this raid to have CCSO deputies under his command participate in the planning and execution of the NBC dragnet under the pretext of supporting a criminal investigation. Defendant Schenck entered the agreement with knowledge that the criminal search warrant for NBC was only for documents; the administrative search warrant permitted only consensual questioning; there were no arrest warrants for any individual at NBC; and that the agents' show of force—including the participation of CCSO—was intended to execute a mass seizure of Latino workers. Defendant Schenck authorized the use of CCSO vehicles and deputies to surround the NBC premises to prevent Latino workers from leaving the premises during the dragnet. Defendant Schenck was personally present at the NBC dragnet in

knowing and intentional support of the unconstitutional suspicion-less seizure that took place inside the NBC facility and the sweep of the parking lot for Latino workers. Plaintiffs sue Defendant Schenck in his individual capacity.

33. Defendant Edgar Lorenzo was a USBP Agent at all times relevant to this action. Agent Lorenzo was one of Ms. Juarez-Lopez's arresting officers listed on her I-213. He is being sued in his individual capacity.

34. Defendant Javier Lorenzo was a USBP Agent at all times relevant to this action. Agent Lorenzo was one of Ms. Juarez-Lopez's arresting officers listed on her I-213. He is being sued in his individual capacity.

35. Defendant Daniel Hutchings was a USBP Agent at all times relevant to this action. Agent Hutchings was one of Ms. Juarez-Lopez's arresting officers listed on her I-213. He is being sued in his individual capacity.

36. Defendant Charlie Rodriguez was a USBP Agent at all times relevant to this action. Agent Rodriguez was one of Ms. Juarez-Lopez's arresting officers listed on her I-213. He is being sued in his individual capacity.

37. Defendant Nicholas Mulzoff was a USBP Agent at all times relevant to this action. He participated in the planning and execution of the mass suspicion-less seizure for non-consensual questioning of NBC employees, including Plaintiffs, during the dragnet at NBC that caused Plaintiffs' wrongful arrests, detentions, deportations, and family separations. Agent Mulzoff was on site at NBC during the dragnet and was assigned to the van transport area. He was one of Ms. Juarez-Lopez's arresting officers listed on her I-213. He is being sued in his individual capacity.

38. Defendants J. DOE 1 through 60 were agents, officers, employees, or otherwise representatives of USBP, ICE/ERO, HSI, IRS Criminal Investigation Division ("IRS-CI"), DHS, the United States Department of Justice, OCSO, or CCSO, at all relevant times. These agents and/or officials participated in the planning, execution, and/or approval of the September 4, 2025, dragnet at NBC, including the pretextual use of criminal process to conduct an immigration dragnet. When Plaintiffs become aware of the true identities of the Doe Defendants, Plaintiffs will amend this complaint to add or substitute them as named Defendants in their individual capacities.

**Defendants in their Official Capacities**

39. Defendant Markwayne Mullin is the Secretary of DHS. Defendant Mullin is responsible for the administration of the immigration laws under 8 U.S.C. § 1103. As Secretary, Defendant Mullin is responsible for overseeing: DHS; its component agencies, including ICE and USBP; and their operations and policies. Defendant Mullin and his delegees have the authority to remediate Mr. Ramirez Perez's wrongful deportation and facilitate his return to the United States from Guatemala. He is sued in his official capacity.

40. Defendant David Venturella is the Acting Director of ICE, and therefore is responsible for ICE's policies, practices, and procedures, including those relating to the detention and removal of noncitizens. He is sued in his official capacity.

41. Defendant Thomas Brophy is the Director of ERO for the Buffalo Field Office of ICE. He is responsible for ICE policies and operations in the Buffalo ICE Field Office's Area of Responsibility, which includes this judicial district and Cayuga County where Mr. Ramirez Perez resides with his family and works. He is sued in his official capacity.

42. Defendant James D'Amato is the Chief Patrol Officer for the Buffalo Sector of USBP. In his role, he oversees the ports of entry in the vicinity of Cayuga County, New York, where Mr. Ramirez Perez resides with his family and works. He is sued in his official capacity.

43. Defendants sued in their official capacity are referred to collectively as the "Official Capacity Defendants."

**FACTUAL ALLEGATIONS**

44. Over the past two decades, Central New York has become home to a growing Latino and immigrant community. Their arrival has been essential to a regional economy where manufacturers and farmers have long struggled to find local workers. But their contribution is not only economic—these immigrants have enriched the civic and social life of Central New York as they settled here, enrolled their children in local schools, grew church congregations, bought houses, and built lives with their families, friends, and neighbors.

45. One of the places where members of these immigrant communities work is NBC—a family-owned manufacturer that has operated at 12351 State Route 34 in Cato, New York, for decades, producing specialty protein and nutrition bars sold under private labels at Costco, Walmart, and other national retailers. Before September 4, 2025, NBC's workforce was overwhelmingly Latino, predominantly consisting of immigrants from Central America. Many had worked there for years.

46. On the morning of September 4, 2025, approximately 160 employees were working at NBC—operating machines, packaging snack bars, working in the front office, and taking breaks in the breakroom and parking lot outside.

47. Mr. Ramirez Perez was a line technician at NBC, ensuring that the factory's machines were working properly. He and his wife, Liz, were both working at the factory that day while their two boys were at school.

48. Ms. Lopez Martinez was working Line 2 in packaging that day. Before she went to work, Ms. Lopez Martinez kissed her son, a U.S. citizen, who had just celebrated his second birthday the day before.

49. Mr. Rojas was also working on Line 2 that day. Mr. Rojas took pride in his Puerto Rican heritage and enjoyed working at NBC, where he could communicate exclusively in Spanish and had built strong relationships with his Latino coworkers.

50. Ms. Juarez-Lopez began her shift at 8 a.m. that morning and started by covering some work for a white colleague who was having breakfast, before Ms. Juarez-Lopez moved back over to her usual line.

51. Among the people who went to work at NBC on the morning of September 4, 2025, many were parents who had school pickup schedules and children waiting for them after work. Many of them never made it home that night.

52. By that evening, approximately fifty-seven people who had worked at NBC had been zip-tied, loaded into transport vans, and taken to detention facilities. Most of the detained workers were rushed out of state or even deported before they had any opportunity to speak to a lawyer, challenge their detention, or say goodbye to their families.

53. When the school day ended, children across the Fulton City School District came home to find their parents gone. Over 20 workers were unlawfully separated from their children after the unlawful NBC dragnet.[1] Mothers of toddlers and infants were arrested without a single question about who would care for their children in their absence. But for one parent's phone

[1] Marnie Eisenstadt, *An immigration raid in NY left two boys with no mom and a brutal choice: Do we stay or go?*, Syracuse.com, Feb. 9, 2026, https://www.syracuse.com/news/2026/02/an-immigration-raid-in-ny-left-two-boys-with-no-mom-and-a-brutal-choice-do-we-stay-or-go.html.

call—made before agents began confiscating workers' cellphones—the school district would have had no idea what had happened and would have sent children home to empty houses.

**Background to the NBC Dragnet**

54. The September 4, 2025, dragnet did not occur in isolation. Rather, it took place against the backdrop of the Trump Administration's broader immigration enforcement policies and directives and its targeting of Latino people.

55. On or around May 20, 2025, Stephen Miller, President Trump's Deputy Chief of Staff for Policy and Homeland Security Advisor, convened a meeting of all twenty-five ICE ERO field office directors and all twenty-five HSI Special Agents in charge at ICE headquarters in Washington, D.C. According to media reports, during that meeting, Miller demanded to know why agents were not conducting more arrests at locations such as Home Depot and 7-Eleven, locations commonly associated with Latino workers, and berated officials for low deportation numbers. Two officials reported leaving the meeting feeling that their jobs would be in jeopardy if they did not make more immigration arrests. [2]

56. Days after that meeting, Miller publicly announced "a goal of a minimum of 3,000 arrests for ICE every day" and 1,000,000 deportations a year for DHS. Federal law enforcement agents operating at the local level reportedly had been told to fulfill quotas of immigration arrests.[3]

---

[2] Anna Giaritelli, *Stephen Miller 'eviscerated' ICE officials in private meeting for low deportation numbers*, Wash. Examiner, May 30, 2025, https://www.washingtonexaminer.com/news/3425297/stephen-miller-eviscerated-ice-officials-deportation-numbers/ (last visited September 9, 2026).

[3] See Cameron Arcand, *Trump administration aims for 3,000 arrests of illegal immigrants each day*, Fox News, May 29, 2025, https://www.foxnews.com/politics/trump-administration-aims-3000-arrests-illegal-immigrants-each-day (last visited Sept. 9, 2026); *Trump administration sets quota to arrest 3,000 people a day in anti-immigration push*, The Guardian, May 29, 2025, https://www.theguardian.com/us-news/2025/may/29/trump-ice-arrest-quota (last visited Sept. 9, 2026); Michael Scherer and Nick Miroff, *Stephen Miller in Retreat*, The Atlantic, May

57. During his campaigns and in office, President Trump, Miller, and other high-ranking officials had long made clear which groups of people they wanted to see arrested and removed from the country—Latino people and non-white immigrants denigrating their character, culture, and humanity.[4]

58. A key part of the Trump Administration's mass deportation agenda has been re-directing federal law enforcement from their traditional missions to implementing mass deportation operations targeting these reviled groups. Given the "incredible amount of pressure for numbers" of immigration arrests and deportations,[5] federal agents often are compelled and even encouraged to engage in racial profiling of Latino people to meet these demands.

59. HSI exemplifies this shift and the resultant racial profiling. As one agent told *The New York Times,* the Trump Administration "changed the mission of Homeland Security Investigations, which falls under the ICE umbrella."[6] Previously, "HSI was entirely focused on

---

2026, https://www.theatlantic.com/politics/2026/05/stephen-miller-trump-ice-immigration/687103/ (last visited Sept. 9, 2026).

[4] *See, e.g.*, C-SPAN, Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country", Dec 16, 2023, https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439. (last visited September 9, 2026) ("During a rally in Durham, New Hampshire, 2024 Republican presidential candidate and former President Donald Trump says illegal immigrants and migrants from 'all over the world,' like South America, Africa, and Asia, are 'poisoning the blood of our country.'"); Stephanie L. Canizales and Jody Agius Vallejo, *Latinos & Racism in the Trump Era*, Daedalus, Spring 2021, https://www.amacad.org/publication/daedalus/latinos-racism-trump-era ("Trump's campaign targeted Latinos via racist and xenophobic rhetoric from its inception.") (last visited September 9, 2026).

[5] Rachel Poser, *et al.*, *Takeaways From The Times's Look Inside D.H.S.*, N.Y. Times, Apr. 14, 2026, https://www.nytimes.com/2026/04/14/magazine/homeland-security-immigration-takeaways.html (last visited September 9, 2026).

[6] Rachel Poser, *et al.*, *The View From Inside Trump's D.H.S.*, N.Y. Times, Apr. 14, 2026, https://www.nytimes.com/interactive/2026/04/14/magazine/trump-dhs-ice-officers-immigration-deportations.html (last visited September 9, 2026).

transnational crime, ranging from human trafficking and smuggling to narcotics trafficking, money laundering and child exploitation. Essentially, we were told to pause all those criminal investigations, unless they have a nexus to an illegal alien. Instead, we'd be doing civil immigration enforcement."[7]

60. Notably, an ICE attorney told the *Times*, "H.S.I. used to investigate companies that were violating labor laws. Now, instead of going after the business owners, they would be going after the employees. They had to hit five workplaces every single day. It started with anything that sounded even vaguely Hispanic and then became completely indiscriminate."[8]

61. Federal agents who participated in the raid communicated this pressure to arrest large numbers of immigrants to their local partners, including to OCSO and CCSO deputies both before and during the NBC dragnet. These communications include remarks made by a federal agent to a CCSO deputy during the NBC dragnet to the effect that since the 2024 election, the focus of HSI agents who participated in the NBC dragnet had been shifted from transnational criminal investigations to civil immigration enforcement, illustrating the staggering demand for immigration arrests.

**Defendants Target NBC's Latino Workforce for a Mass Seizure by Applying for Search Warrants Under the Premise Agents Will Conduct Only "Consensual Questioning" of NBC Workers**

62. In support of the Trump Administration's immigration enforcement agenda to deport Latino people and other non-white immigrants en masse, agents from HSI, ICE, and USBP, working with OCSO and CCSO deputies, planned an immigration dragnet at NBC. These agents

---

[7] *Id.*

[8] *Id.*

targeted this plant because they understood that NBC employed many workers who appeared to be foreign-born, specifically from Central and South America.

63. To facilitate the mass seizure of NBC's Latino workforce, on August 28, 2025, HSI Special Agent McCoy submitted two separate warrant applications to United States Magistrate Judge Dancks.

64. The Rule 41 warrant application sought authority to search the NBC premises for "evidence, contraband, fruits, and instrumentalities" of violations of 8 U.S.C. § 1324 (harboring unauthorized noncitizens), 18 U.S.C. § 1028 (identity document fraud), and 42 U.S.C. § 408(a)(7)(B) (misuse of Social Security numbers). The government applied for permission to search for and seize NBC's financial records, employment records, and electronic equipment. The Rule 41 warrant did not expressly seek authority to seize employees' personal electronic devices or to seize employees' personal immigration documents, such as green cards. Nor did the Rule 41 warrant seek authority to seize and arrest any specific individual.

65. The second application sought an administrative warrant known as a *Blackie's* Warrant. The *Blackie's* warrant did not seek (and could not) seek authority to seize any persons. Rather, the application only requested authority to enter the NBC facility to search for noncitizens and to engage in consensual encounters with employees concerning their immigration status.[9]

[9] *Blackie's* warrants are of dubious constitutional validity, as a United States Magistrate Judge in the Southern District of Texas persuasively showed in twice rejecting the government's application for a *Blackie's* warrant. *See In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970, 971–75 (S.D. Tex. 2025); *see also In re Sealed Search Warrant Application*, 787 F. Supp. 3d 813, 817 (S.D. Tex. 2025) (rejecting second, substantially similar application). But even assuming the constitutional validity of *Blackie's* warrants, the decision to seek one for the NBC premises was in conflict with the directives of the *HSI Search and Seizure Handbook*. The *HSI Search and Seizure Handbook* unequivocally states that administrative search warrants should only be sought "[i]n those immigration-related enforcement operations where . . . no criminal prosecution is contemplated . . . ." *See* Homeland Security Investigations, *Search and Seizure Handbook*, HSI HB 12-04, Sept. 14, 2012, at 36, https://www.ice.gov/doclib/foia/policy/hsi12-

66. The Fourth Amendment only permits agents to ask questions concerning citizenship or immigration status or request identification without individualized suspicion when the encounter is consensual. *INS v. Delgado*, 466 U.S. 210, 216-17 (1984); *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991). A non-consensual seizure for immigration questioning—i.e. detaining a person who did not feel free to leave—requires, at minimum, *individualized* reasonable suspicion, based on specific and articulable facts, that the person is unlawfully present in the United States. *See* 8 C.F.R. § 287.8(b)(2). A warrantless civil immigration arrest imposes an even higher standard—the agent must have "reason to believe" both that the person is unlawfully present and that they are "likely to escape before a warrant can be obtained." 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii). That escape determination cannot be inferred from unlawful presence alone and demands an individualized assessment of the person's circumstances, including their community ties. In seeking the administrative *Blackie's* warrant, the government represented to the Magistrate Judge Dancks that its agents would abide by this framework. As set forth below, they did not.

67. In their warrant application to the court, the government acknowledged the limitations on their authority under a *Blackie's* warrant. Specifically, the memorandum of law in support of the *Blackie's* warrant application notified Magistrate Judge Dancks that the "purpose" of the warrant was "to obtain authority to search" the facility—that is, to authorize entry onto NBC's property—not to seize workers for non-consensual questioning. Under that authority, the government represented that agents could "engage in *systematic consensual questioning* of

---

04_SearchSeizure_09.14.2012.pdf (last visited Sept. 9, 2026). But here, HSI Special Agent McCoy represented to Magistrate Judge Dancks in his application for the Rule 41 warrant that a search warrant was required *because* a variety of criminal charges were contemplated—at least, pretextually.

employees," *United States v. Juarez-Lopez*, 5:25-cr-00424 (BKS/TWD), Dkt. No. 33-3 at 6 (emphasis added).

68. The government went further, expressly acknowledging the individualized-suspicion standard that governs any escalation beyond consensual questioning: "It is well settled that agents may detain a person absent valid seizure or arrest warrants or valid exigent circumstances *only* if they possess reasonable, articulable and individualized suspicion of violations of immigration or criminal law." *Id.* The government also acknowledged that "warrantless civil immigration arrests" must be "based on [] probable cause" that a person is unlawfully present in the United States, *id.* at 7, an even higher degree of individualized suspicion than required for non-consensual questioning.

69. The warrant application did not articulate any individualized basis to seize any of the Plaintiffs or seek permission to arrest or detain any person found at the factory. *Juarez-Lopez*, 813 F. Supp. 3d at 334; Dkt. No. 33-1 at 1.

70. Although the government represented to Magistrate Judge Dancks that agents would honor these constraints, "agents' actions differed drastically from these representations" when these warrants were executed at NBC. *Juarez-Lopez*, 813 F. Supp. 3d at 340. Indeed, the government later admitted that the agents executing the warrants seized NBC workers without individualized suspicion before subjecting them to non-consensual questioning about their citizenship and immigration status. *Id.*

71. The government also represented to Magistrate Judge Dancks that agents would conduct the Rule 41 document search concurrently with "engag[ing] in consensual conversations with individuals on site and to detain individuals for whom they have or develop reasonable suspicion or probable cause of immigration law violations." *United States v. Juarez-Lopez*, No.

5:25-cr-00424 (BKS/TWD), Dkt. No. 33-3 at 1–2 n.2. The government's memorandum of law explained that it sought authority in the *Blackie's* warrant application to remain on the NBC premises to conduct further consensual questioning because "it may take longer to speak to all the individuals on site than to seize the records, and some illegal alien employees at the PREMISE may not be near the location of the records sought to be seized under the Rule 41 warrant." *Id.*

72. The implication of the government's representation to Magistrate Judge Dancks was clear: The Rule 41 document search would begin immediately, and agents would concurrently engage in consensual questioning of employees at locations around the factory.

73. On August 28, 2025, Magistrate Judge Dancks issued both warrants. The issuance of these warrants, however, was conditioned on the government's representation that the agents executing the warrant would only engage in "consensual questioning" of employees during the search of NBC. *Juarez-Lopez*, 813 F. Supp. 3d at 333–34.

74. The federal agents and sheriff's deputies who participated in the raid were all briefed on the scope of the *Blackie's* warrant, as well as the personnel, tactics, vehicles, and equipment to be used in executing the warrants at NBC. A conversation between a USBP agent and a CCSO deputy that occurred during the September 4 dragnet reveals that, while neither had ever seen or executed a *Blackie*'*s* warrant before, they had been informed by an Assistant United States Attorney ("AUSA") in a pre-operation briefing that the warrants only permitted consensual questioning at the factory. The two agents' exchange, however, makes clear that letting workers decline to answer questions was not part of the plan. Another conversation between agents during the dragnet shows that they knew they were not authorized to restrict workers' movements—even as they and other agents were actively doing just that while subjecting them to non-consensual questioning about their citizenship and immigration status. As these and the other agents present

at NBC on September 4 were well aware, neither warrant authorized a mass seizure for non-consensual questioning.

75. As shown in detail below, the agents who executed the warrants used the warrants as a pretext to gain entry to the NBC premises, with no intention of abiding by the government's representations to Magistrate Judge Dancks. The federal and local agents present on the NBC premises on September 4, 2025, engaged in a mass seizure of the entire workforce—with the critical exception of white employees in the parking lot[10]—who were left alone—conducted coercive, non-consensual questioning of workers about their immigration status, and arrested at least fifty-seven NBC employees. Only after completing these unlawful actions did the agents begin the Rule 41 document search—the search that was purportedly at the heart of the warrant applications.

**Federal and Local Law Enforcement Defendants Enter into a Conspiracy to Execute a Racially-Driven Dragnet at NBC Beyond the Scope of The Warrants**

76. In the days leading up to September 4, 2025, agents from HSI, ICE, USBP, IRS-CI, OCSO, and CCSO attended pre-raid briefing and planning meetings. These meetings established a formal mechanism through which Defendants from each of these agencies reached a shared understanding—a meeting of the minds—of the scope, tactics, objectives, and purpose of the September 4 operation.

77. These plans also involved senior officials at DHS in Washington, D.C. Indeed, video footage shows an HSI agent stating with respect to the worksite operation at NBC, "anything like this it has to go all the way up to DC."

[10] The parking lots at NBC were included in the scope of the premises to be searched in both the Rule 41 warrant and the *Blackie's* warrant.

78. CCSO expressly agreed to participate in the operation. Pursuant to this agreement, CCSO deployed several deputies and a substantial number of vehicles to the NBC premises on September 4, 2025 to secure the perimeter and prevent workers from leaving the factory. Sheriff Schenck was himself on the scene at NBC during the course of the operation on September 4, 2025.

79. OCSO also expressly agreed to participate in the operation. On information and belief, OCSO executed this agreement by deploying several deputies to the NBC premises on September 4, 2025, to assist federal agents and prevent workers from leaving.

80. At least one local law enforcement deputy entered the factory as part of the September 4, 2025, dragnet, wearing body armor with "SHERIFF" printed on it and a face covering, carrying zip ties, and assisting with the seizure of NBC workers.

81. The HSI, ICE, USBP, IRS-CI, CCSO, and OCSO agents that participated in the NBC dragnet shared the common goal of meeting the Trump Administration's arrest quotas and increasing the number of arrests and deportations of Latino immigrants without regard to their constitutional rights. Accordingly, they agreed to plan, authorize, and execute a mass seizure of the predominantly Latino workforce at NBC for the purpose of arresting and deporting as many Latino workers as possible, without regard to individualized suspicion, lawful work authorization, pending immigration proceedings, requests for counsel, or other facts bearing on whether those workers could lawfully be seized, arrested, detained, or removed.

82. Collectively, they reviewed both warrants and agreed on a plan that violated the scope of those warrants and that was ultimately executed at NBC on September 4: entering the premises with a massive show of force, seizing all Latino workers present on the property, and forcing the workers who were inside the factory into a single area where they would be subjected to non-consensual questioning about their citizenship and immigration status.

83. Revealing the collective aim to seize people without individualized suspicion as part of the dragnet, less than thirty minutes after agents first entered NBC, while agents were still questioning and sorting workers, an agent whose uniform displayed the word "SHERIFF" asked HSI Agent Bell in a hallway inside NBC, "How many did you grab?"

84. As later captured on body camera footage, agents admitted that they were aiming to conduct the dragnet at a time when there were as many workers as possible present—even expressing concern that they might show up at NBC at a time when few workers would be present. The suspicion-less seizure of U.S. citizens and other people authorized to work for non-consensual questioning about their immigration status was an anticipated part of the dragnet to achieve the purpose of arresting, detaining, and deporting as many Latino immigrants as possible. Once it was revealed that they had successfully arrested and detained many workers on September 4, the same agent whose uniform displayed the word "SHERIFF" celebrated that they got "fucking sixty . . . illegals."

85. Critically, Defendants were well aware that this planned operation exceeded the scope of the two warrants. In fact, as captured on camera, an HSI agent admitted that the Rule 41 warrant was a pretextual tool for conducting the dragnet, stating that worksite enforcement operations "almost need[] a criminal aspect to it" because "[t]hat's the only way you're gonna get anything approved."

86. Further, the federal and local agents were all briefed by an AUSA that their authority under the warrants only permitted "consensual encounters" and that they could not technically prevent workers from leaving. Despite this briefing, federal and local agents disregarded the information about the constraints on their authority and agreed to conduct a mass seizure and to intentionally create a coercive, threatening environment, in which armed agents

would surround the premises, sweep the factory, guard entryways, yell commands, separate workers by status, and engage in involuntary questioning so that individuals would not feel free to resist their demands and leave. Fully aware of the illegal nature of their actions, some agents attempted to conceal these violations by selectively turning their body cameras on and off while other agents repeatedly advised one another when they were being recorded.

87. The Defendant HSI, ICE, IRS, USBP, OCSO, and CCSO agents' preparation for the dragnet shows that they planned to exceed the scope of the warrants. Agents from OCSO, CCSO, and federal agencies coordinated blocking of all exit routes from the NBC premises, guarding exits to the factory, and deploying a helicopter and dogs to monitor and ensure that no Latino workers left the premises. They planned entries from multiple entrances to the NBC production facility to surprise and seize workers and ensure that no workers left the building before agents could question them. These Defendants pre-arranged a plan for seizing, interrogating, and sorting NBC's workforce on the NBC premises while denying workers opportunities to make calls to their families or lawyers, including by cutting off NBC's wireless internet, which had enabled phone calls inside the factory where cellular signal was poor. They mapped out a process for detaining workers at USBP stations where detained workers would continue to be denied access to counsel and agents would refuse requests by family members and attorneys to confirm the identities of those detained there.

88. Throughout the dragnet operation, agents communicated with each other about the execution of the plan using the encrypted, ephemeral messaging app Signal.

89. These executed plans alone reveal that federal and local agents agreed to, organized, and prepared for a dragnet seizure of NBC's Latino workforce in conscious disregard of the warrants' restrictions and these workers' rights.

**The Dragnet**

90. In executing the warrants at NBC on September 4, 2025, "agents' actions differed drastically from the[] representations" made to Magistrate Judge Dancks in the warrant applications. *Juarez-Lopez*, 813 F. Supp. 3d at 340. "Instead of approaching and consensually questioning employees," as the warrant application represented agents would do, agents immediately conducted a mass seizure of NBC workers "without individualized suspicion . . . shortly after entering the factory." *Id.*

91. The morning of September 4, 2025, began like any other workday at NBC. Each Plaintiff arrived at work before 9:00 a.m. and was inside the NBC production facility. Some had been working for hours while others were just beginning their shifts. The plant's general manager estimated that morning that there were approximately 160 NBC employees on site before the dragnet began. A large majority of NBC employees were inside the factory at the time agents arrived, while some were in the parking lot on break.

92. At approximately 9:18 a.m., a large convoy of federal and local law enforcement vehicles descended onto the factory. Agents on ATVs surrounded the property on all sides; SUVs transporting agents pulled into the parking lot; empty vans equipped to haul off immigrant workers soon followed; a large mobile command center operated by CCSO was parked outside the factory; aerial support could be heard overhead; and dogs from K-9 units were patrolling the property.

93. Approximately sixty agents in tactical gear—many wearing face-coverings; many visibly carrying firearms, including in some instances long guns; many wearing body armor; and some with clutches of zip ties visibly displayed on their uniforms—poured out of their vehicles. Some agents wore uniforms that looked like military fatigues.

94. Local and federal agents stationed themselves on the perimeter of the facility to ensure that Latino workers did not leave the premises while the dragnet was conducted.

95. Minutes later, USBP and HSI agents began entering the facility through multiple rear and side doors. Agents reportedly used crowbars to pry open some doors to gain entry to the facility. Immediately after gaining entry, agents began to sweep through the factory looking for employees to round up for questioning. There is no indication that agents anticipated any safety threats from the workers or that any threats to officer safety reasonably should have been anticipated. The warrant applications contained no mention of weapons, contraband, dangerous individuals, or any other threats to safety or to the integrity of the evidence the agents purportedly sought—i.e., HR documents and IT equipment. Extensive footage of the raid itself contains no mention of safety threats, shows no safety threats, and exhibits agent behavior that reflects no safety concerns at all. Instead, the raid planning and agent remarks demonstrate an exclusive preoccupation with seizing as many people as possible for immigration screening and arrest.

96. HSI Special Agent McCoy was seeking entry through the front door of the factory when NBC general manager Christopher Massaro let him in along with a group of other agents. An HSI agent wearing a mask who had already entered the factory through a different entrance met Special Agent McCoy in the lobby.

97. An agent with a camouflage face covering and a black hat, whose clothing identified him in two places as "SHERIFF," entered the factory among the surge of agents coming through the front door. Affixed to the front of his uniform were multiple zip ties, easily accessible and ready to be deployed.

98. Mr. Massaro informed HSI Special Agent McCoy that about 160 employees were currently working.

99. Within minutes after entering, agents directed Mr. Massaro to make an announcement to all employees—first in English, then repeated by an agent in Spanish—that police had arrived with a warrant, and that all workers were to report to the factory's breakroom. The agents also commanded the plant supervisor to have employees turn off all equipment. Defendant Brandon Geer commandeered NBC's intercom system to make this announcement ordering employees to go to the breakroom and shut down normal operations.

100. During and after the announcement over the factory intercom system, agents continued to sweep the factory's production area and warehouse for employees, directing everyone to report to the breakroom. Agents rounded up workers from every corner of the facility and ordered them to stop work, shut off machines, and proceed to the breakroom. Multiple male agents entered occupied women's bathrooms to search for and seize workers.

101. Agents from the IRS Criminal Investigation division were among those agents who swept through the factory forcing NBC workers into the breakroom for non-consensual questioning. If the IRS-CI agents were truly present to engage in a criminal investigation rather than a civil immigration dragnet, their search for people would have required a Rule 41 warrant authorizing them to search for people. But the government did not request the authority to search for or seize people in connection with their Rule 41 warrant application and the warrant that was issued did not covey such authority. The participation of IRS-CI agents in the mass seizure of NBC workers further shows the pretextual nature of the criminal investigation into NBC. At one point during the dragnet, a group of IRS-CI agents approached an HSI agent who had previously entered women's and men's bathrooms to seize workers. One IRS-CI agent joked "[d]id you have to wipe some asses?" The IRS-CI agent then realized and acknowledged that the HSI agent's body-camera was rolling.

102. HSI Special Agent Lindsey Valentino was one of the agents directing the dragnet from inside the factory. She both directed and personally participated in sweeping the NBC employees into the factory's breakroom. As she swept through the factory, she encountered a Latino employee walking calmly on the factory floor. On information and belief, at that time, HSI Special Agent Valentino did not know the employee's name, immigration status, or facility with English. However, she immediately yelled at him, "Vamonos!" and ordered him to go to the breakroom. That Latino employee was a lawful permanent resident.

103. HSI Special Agent Valentino then entered the breakroom where over a dozen Latino workers were seated. She yelled at all the workers in the breakroom to "stay here" and to "sit down" in English and broken Spanish.

104. HSI Special Agent Valentino again encountered the same Latino lawful permanent resident in the breakroom whom she had initially commanded to go there. He was standing as other workers in the room began to sit. In response, HSI Special Agent Valentino moved toward him and yelled at him in English and broken Spanish to sit down. He complied.

105. After an initial sweep, HSI Special Agent Valentino ordered other agents to conduct secondary searches of the factory to try and find any employee who had not been captured in the first sweep.

106. Prior to forcing everyone into the breakroom area for questioning, Defendants neither knew nor asked the names, citizenship, or immigration status of Plaintiffs or any of the other NBC employees they seized that morning.

107. Each Plaintiff followed the agents' orders to go to the breakroom. None felt free to do otherwise.

108. On the whole, Defendants gathered and confined approximately 100 employees in and around the breakroom—the vast majority of whom were Latino. Defendants made clear that everyone in the breakroom, including each Plaintiff, was required to remain in the breakroom pending further questioning from agents. Agents were stationed at the door to ensure that people could not move freely in and out of the breakroom.

109. While federal agents and at least one sheriff's deputy inside the factory carried out this mass suspicion-less seizure, agents from CCSO, OCSO, USBP, and ICE ERO patrolled the parking lot and the exterior of the property. Many of these agents carried long guns.

110. Some NBC employees were on their breaks when agents arrived at the plant that morning. As is typical during break time, a mix of workers—some white, some Latino—were in the parking lot outside the facility, getting some air, having a cigarette, making a phone call, or eating a snack.

111. While agents inside the factory were ordering NBC employees into the breakroom area, agents outside the factory encountered multiple white NBC employees in the parking lot. Agents did not detain or question any of the white employees about their citizenship or immigration status. Instead, agents simply told these white workers that the factory was closed for the day and advised them to go home.

112. In stark contrast, agents detained and questioned every Latino person they encountered in the parking lot during that time.

113. An exchange between several agents and a white NBC employee confirms the racial bias animating this operation.

114. At approximately 9:22 a.m.—only four minutes after agents first entered the factory and before any NBC worker had been questioned, let alone arrested—ICE Agent Michael Donnell,

a federal agent with the initials "J.O.", and a third Doe federal agent spoke to a white NBC employee who had walked over to them in the parking lot.

115. The employee asked the agents about a colleague of his working inside the factory named "Steve." In response, the agents asked him what Steve looked like and he replied: "he's a white guy." The agents made clear that a white guy inside the facility wouldn't have any problems during the operation and one agent expressly stated, "that's kind of the point." The employee replied, "Ok, that's what I figured."

116. Agents did not know or ask for Steve's last name or immigration status. Even though there was a criminal investigation ongoing at the factory, the only information the agents asked for was what Steve looked like—and the fact that Steve was white was all they needed to determine that he would be fine.

117. The agents otherwise left this white NBC employee in the parking lot alone without detaining him or subjecting him to any questioning about his citizenship status.

118. Meanwhile, agents in the parking lot surrounded and detained Latino workers sitting in parked vehicles. Unlike the white workers in the parking lot, agents seized and questioned these Latino workers.

119. For example, when HSI Agent Regan D. arrived in the parking lot at approximately 9:20 a.m., she pulled up next to a car in which Latino workers on break were sitting. She looked into the car directly at these workers and then motioned to other nearby agents. She then informed a group of male agents that "[t]here's two dudes in that car." Multiple agents then surrounded the vehicle and seized and questioned these Latino workers.

120. Immediately after directing agents to investigate the Latino workers, HSI Regan D. passed three white civilians standing in the parking lot. She did not direct any agents to investigate

these white workers. The only words she said to any of these three white workers was a friendly, "Hi."

121. Elsewhere in the parking lot during the operation, a USBP Agent named Dennis denigrated the character, culture, and humanity of Latin American immigrants. In one conversation with another USBP agent, USBP Agent Dennis referred to Latino immigrants as "animals" and when describing Latino children in immigration detention, he asked rhetorically, "what do you think they're gonna do to your U.S. child?" These and other degrading comments were met with laughter and agreement by the other USBP agent while CCSO Deputy Doe watched and listened.

122. Over two hours later, USBP Agent Dennis made additional remarks to CCSO Deputy Doe about Latino immigrants and children. After again denigrating children from Central America in immigration detention and referring to some as "kingpins," he explained his concern that "those people" are coming "into our communities" where "we treat our children differently." In further explaining why Latin American immigrants should not be allowed to remain in the United States, USBP Agent Dennis called Latin American children "literal street rats," explaining that in their home countries these children are treated like "animal[s]" and commodities by their families and will "eat our kids for breakfast." Agent Dennis's remarks were again met with laughter and agreement by CCSO Deputy Doe, who responded "oh yeah" to Agent Dennis' comments.

123. At approximately 10:00 a.m., after agents had seized workers through the dragnet, ICE Agent Michael Donnell approached three federal agents in the parking lot, including HSI Agent Jake Matthew Bell, and remarked, "Do you want to fucking Power Ranger some shit?" while motioning his fists up and down. He then added, "Oh well I just wet down about seventy-

four fucking Guatemalans." These comments were met with laughter, including by HSI Agent Bell, whose body camera was on, and who laughed as he walked away.

124. Despite the breadth of the comments captured on body camera footage, these statements represent only a small portion of what was said during the raid. Many agents were not wearing body cameras at all. Some who did wear cameras turned them off for significant portions of the raid or alerted other agents that their camera was recording before their colleagues spoke. Other agents made deliberate efforts to avoid being caught on camera. On information and belief, agents turned off their body cameras to avoid recording evidence of the bias motivating the dragnet, as well as evidence of misconduct in planning and executing the dragnet.

125. Back inside the factory, approximately 100 workers, including each Plaintiff, remained detained inside the breakroom and in the surrounding areas while agents blocked the exits from the breakroom. Agents then began to question and sort detained workers. Prior to forcing these workers into the breakroom area, agents did not know or ask the names or immigration status of any of these workers—in other words, they lacked the individualized suspicion the Fourth Amendment requires to seize these workers for questioning.

126. But "[i]nstead of approaching and consensually questioning employees," as the government represented to Magistrate Judge Dancks that they would do, "agents (without individualized suspicion) . . . 'seized all employees'" and then "directed employees to self-identify as citizens or noncitizens authorized to work." *Juarez-Lopez*, 813 F. Supp. 3d at 340.

127. Specifically, agents asked who in the breakroom was a U.S. citizen or had authorization to work, and one by one directed workers who answered affirmatively to the warehouse across the hall—where they remained detained and were not free to leave. Agents required every single employee who was seized—whether they identified themselves as a U.S.

citizen or not—to speak to an agent individually and to answer personally identifying questions before they were either eventually permitted to leave the factory or arrested.

128. At no point did any agent advise any of the NBC workers who were subject to a suspicion-less seizure and questioning that they were free to decline to answer questions or otherwise terminate the encounter.

129. Once those who self-identified as U.S. citizens or having authorization to work were escorted to the warehouse, a male USBP Agent then told HSI Special Agent Valentino that everyone left inside the breakroom was not a U.S. citizen. Shortly after, a female USBP Agent wearing a face covering confirmed that only "ten fifteens" remained inside the breakroom.

130. In law enforcement, "ten fifteen" refers to a prisoner in custody. In other words, agents knew that everyone in the breakroom was being held in custody and subject to non-consensual questioning about their immigration status—*not* consensual questioning as permitted by the search warrants. However, at this time, named Plaintiff Mr. Rojas, a U.S. citizen, and at least one legal permanent resident, remained inside the breakroom.

131. HSI Special Agent Valentino then started commanding all people inside the breakroom to go to the left side of the room and line up. She and other agents restricted the movements of workers in the room.

132. For example, HSI Special Agent Valentino shooed one female worker away from opening her locker and snatched a pen out of her hand. There was no reason for HSI Special Agent Valentino to confiscate the pen other than to exert control and make clear that the woman was not free to leave, document her circumstances, or decline to answer agents' questions.

133. Agents then forcibly questioned the remaining workers in the breakroom—on information and belief, all of whom were Latino—asking them where they were from and whether they had "documents."

134. This process of non-consensual interviewing of every employee as a prerequisite to leave the breakroom is "the exact opposite of the types of encounters that the Government told the magistrate judge they would do." *Juarez-Lopez*, 813 F. Supp. 3d at 340.

135. Workers in the breakroom were each required to speak to an agent.

136. Multiple workers asked agents for a lawyer or otherwise declined to answer agents' questions. Agents arrested those workers anyway and sorted them with other workers who were not free to leave.

137. Meanwhile, in the warehouse, agents had begun interrogating those who self-identified as U.S. citizens or as having valid EADs.

138. U.S. citizens also were not permitted to leave until they provided agents with further personal information. At one point, a female IRS-CI agent wearing a face covering announced that all U.S. citizens needed to line up and provide their name, date of birth, address, and a contact phone number. The agent explained that only "after that you will be free to leave."

139. Even presenting a valid green card did not end the scrutiny of Latino workers. One agent repeatedly insisted that a Latino worker's green card was fake and asked him where he bought it. Agents subjected this worker to an extended interview while scrutinizing his identification before being satisfied with its legitimacy. Only then was he sent to join the U.S. citizens and other legal permanent residents in the warehouse for further questioning.

140. Federal agents then began to record the requested personal information for each U.S. citizen and legal permanent resident who had been seized and was being held in the warehouse before permitting them to leave.

141. At approximately 9:49 a.m., Special Agent McCoy confirmed that agents could begin to release "screened" U.S. citizens who had been seized in the dragnet. He indicated that this instruction came "from Todd."

142. Even after U.S. citizen and lawful permanent resident workers provided their personal contact information, they had to be individually escorted out of the factory by agents before they were free to leave.

143. Workers in the warehouse who had valid EADs, social security cards, and pending immigration cases were informed this was not sufficient—only legal permanent residency, a visa, or citizenship would protect them from arrest, detention, and deportation. Those workers were labeled "ten-fifteens" and were either sent back to the breakroom to join others deemed deportable or forced to wait in the warehouse. Likewise, those originally sorted in the breakroom who could not prove they had one of these statuses continued to be held there against their will. All of these individuals were subjected to arrest.

144. Agents did not have an arrest warrant for any person they arrested at NBC on September 4, 2025.

145. Prior to holding people in custody at NBC on September 4, 2025, agents did not establish that they had probable cause to question or arrest any individual, nor did they establish that any individual was a flight risk so as to justify a warrantless arrest. Agents not only failed to affirmatively assess whether any person they arrested had minor children, significant ties to the community, or other indicia that they were not a flight risk, but also ignored affirmative evidence

that those they arrested were not flight risks. That morning, agents unlawfully arrested the parents of over twenty children, including a group of mothers with children under the age of three who would not see those children again for months. They also arrested and restrained a pregnant woman who would spend months of her pregnancy losing weight in a detention center in Louisiana.

146. Contrary to the representations in the warrant application that the Rule 41 document search would commence and "consensual questioning" would occur concurrently with that search, the Rule 41 document search did not begin until agents had finished conducting their immigration dragnet of the NBC workforce, further demonstrating that the true purpose of the raid was to seize, question, and arrest as many Latino workers as possible, and not to search for NBC corporate records.

147. Critically, following the dragnet, no one has been charged with any of the crimes described in the Rule 41 warrant signed by Magistrate Judge Dancks, revealing the pretextual nature of this effort. On information and belief, to date, the only criminal charges that resulted from the unlawful seizure of over 100 workers were five charges of unlawful re-entry in violation of 8 U.S.C. §1326. Notably, agents could not have possibly possessed probable cause to arrest anyone for unlawful re-entry while conducting the dragnet at NBC because such a charge requires a careful review of an individual's deportation history.

148. One of the NBC workers charged with unlawful re-entry, Plaintiff Ms. Juarez-Lopez, contested the charges and filed a motion to suppress evidence against her on the grounds that it was obtained in violation of the Fourth Amendment. The court granted the motion, finding that Ms. Juarez-Lopez's rights had been violated by agents' conduct in the course of the NBC dragnet and that the suppression of evidence was warranted because "[g]ood reason exists to deter future conduct of the type that happened here." *Juarez-Lopez*, 813 F. Supp. 3d at 347. Specifically,

the court found that agents arrested Ms. Juarez-Lopez "following a mass seizure carried out in a manner materially different from what the Government represented to the magistrate judge—and only after a short interaction with an agent during [which] she invoked her right to counsel." *Id.* The court also found that a DHS report of Ms. Juarez-Lopez's arrest (I-213) contained purported admissions of unlawful presence "that, evidently, never occurred." *Id.* at 346. The original criminal complaint against Ms. Juarez-Lopez echoed this false statement and claimed that agents discovered Ms. Juarez-Lopez's immigration status "while-on-scene" at NBC. Upon information and belief, testimony presented to the Grand Jury may have also included these false allegations related to the timing of when Ms. Juarez-Lopez's immigration status was discovered.

149. DHS arrest reports prepared for other workers at NBC—who either remained silent or invoked their right to counsel in response to officers' questioning—contained similarly false statements. Agents fabricated information in arrest reports to cover up that they lacked any basis to seize and arrest workers at NBC. As noted above, the government acknowledged in its Memorandum of Law to Magistrate Judge Dancks that any seizure of a person required that agents obtain independent facts supporting an arrest. Here, when employees refused to answer questions or asked for a lawyer, agents arrested those people anyway and then subsequently lied about admissions that were never made at the factory to invent a basis for the illegal seizure.

**<u>Wrongful Detentions, Deportations, and Family Separation</u>**

150. After workers were subject to non-consensual questioning about their citizenship and immigration status, agents continued to detain individuals they deemed deportable even where

these individuals had valid EADs, social security documentation, pending immigration cases, or letters from counsel detailing their representation and ongoing cases.

151. If any worker attempted to advocate for themselves, they were met with contempt, aggression, and threats. While they remained in the factory, these workers were under constant surveillance by armed agents.

152. In some instances, agents refused to acknowledge legal documentation proving that these individuals were not removable and denied workers' requests to contact their attorneys. As a result, named Plaintiffs Ms. Lopez Martinez and Mr. Ramirez Perez continued to be held against their will.

153. These individuals, including these named Plaintiffs, were subject to intrusive searches and forced to surrender their phones, belts, shoelaces, and other personal belongings.

154. Officers then began to move workers they deemed deportable outside the factory. Detained workers were placed in restraints and loaded into vans and transported to the Oswego Border Patrol Station ("Oswego Station"). Workers were transported in groups using four vans, with men being taken first, followed by the women in separate batches.

155. As the dragnet unfolded, the school day was coming to a close across town. At least twelve students in the Fulton City School District had a parent at NBC that morning. One worker's eight-year-old needed to be picked up that afternoon, while another woman's three-year-old son was dropped off at home to find his mother missing. At least three other detained women were separated from children under the age of two. Those children would not see their mothers again for months.

156. When one of the women asked an agent for a phone call to arrange pickup for her son, he denied her request and suggested the child would find his way home. He then told her that if she signed voluntary departure papers, she would be reunited with her son faster.

157. Similarly, another mother told an agent she needed to coordinate childcare for her three-year-old. The officer did not respond.

158. Defendants generally disregarded the requirements of ICE Directives 11064.4, Detention and Removal of Alien Parents and Legal Guardians of Minor Children, and 11032.4, Identification and Monitoring of Pregnant, Postpartum, or Nursing Individuals, in their treatment of pregnant and parenting workers.

159. Most workers were taken first to Oswego Station. People with valid EADs, pending immigration appeals, and open court dates sat in crowded cells without any recourse. Some people were held in cells with approximately thirty other workers where the only toilet was in the open—without a door or privacy screen—and visible to everyone in the cell. Women took turns covering each other when someone needed to use it.

160. Those detained at Oswego Station were not permitted to call their families or lawyers. Although some agents allowed a few women with children under the age of three to make short calls to check on them, the agents instructed the women that they could not inquire about lawyers or offer any information about their location or conditions of confinement.

161. For example, one woman begged the agents for a call to check in on her fifteen-month-old baby who had been sick the night before the dragnet. Despite her pleas, the agents only permitted her to make a five-minute call, and not until the following day. Before she dialed, the agents informed her that she could not mention where she was, describe the conditions, or ask for a lawyer, even threatening to immediately end the call if she so much as mentioned a lawyer. As

she called her husband, two male agents and one female agent guarded her, counting the minutes and monitoring her words as she asked about her baby.

162. For five days, one woman was unable to reach her family despite informing a male agent that she had an eight-year-old child who needed to be picked up from school. The agent denied her the ability to call to make arrangements for the child's pickup.

163. Moreover, when lawyers called Oswego Station, agents refused to tell them whether their clients were detained there or to facilitate access to their clients.

164. From Oswego Station, these arrested workers were transferred thousands of miles from their children, their attorneys, and anyone who might have reached them in time to contest their detention before being transferred out of state. Agents gave the detained workers no advance information about whether or where they were being transferred, let alone any opportunity to notify their families or attorneys.

165. The facilities to which they were transferred were also in poor condition, and many workers faced harassment and mistreatment upon their arrival at these facilities. Ripped away from their families and attorneys, these workers had significantly fewer resources and support while detained in these centers. Many complained to community advocacy groups about hunger and lack of adequate medical care. Many were also repeatedly pressured to sign voluntary departure paperwork. These conditions wore on these individuals' will to continue fighting their removal and to remain detained far away from their families. On information and belief, the decision to transfer those detained during the September 4, 2025, NBC dragnet to these remote detention centers was in part to coerce their self-deportation.

166. During this period, advocacy organizations struggled to locate and contact detained workers. Only after they were transferred across the country were individuals permitted to make

brief and limited phone calls. Because of these intentional obstacles, these organizations still could not account for the whereabouts of multiple NBC workers over two weeks after they were arrested during the dragnet.

167. Critically, following their transfer to these facilities, several workers, including named Plaintiffs Ms. Lopez-Martinez and Mr. Ramirez Perez, were rapidly deported—within 72 hours of the dragnet—irrespective of their right to remain in the country. They did not sign voluntary departure paperwork or have final removal orders and were deprived of any opportunity to contest their deportation.

168. Agents, however, took pride in ripping NBC workers from their homes and community and tearing apart families. In the parking lot after the dragnet, when one agent asked a group of agents what they were supposed to do with the photos of detained workers they took, the agents joked and laughed that they should post the images to Facebook and e-mail them to President Trump.

169. Indeed, the Instagram account for the Chief Patrol Agent of USBP's Buffalo Sector, which includes Oswego Station, celebrated their work by posting videos and images that included Mr. Ramirez Perez among other Latino men in shackles on a tarmac as they were led to a deportation flight on a Department of Homeland Security Plane.







In addition, the Chief Patrol Agent of USBP's Buffalo Sector also uploaded an Instagram post that included photos of these men boarding this deportation flight, captioning it "Shackled. Boarded. Deported."



170. On September 5, 2025, the day after the dragnet operation, OCSO published a press release that provided additional insight into the NBC Dragnet. The release purported to "provide details on its participation in a long-term, multi-agency Federal Criminal Investigation" and noted that OCSO was on the scene to assist federal officers with the NBC Dragnet.

171. The September 5 press release acknowledged "public concerns" that several traffic stops conducted by OCSO deputies in the previous year were racially motivated or based on immigration status. The OCSO release claimed that "many of these stops were a necessary part of our assistance to Federal Law Enforcement, to assist in identifying individuals involved in criminal activity."

172. The public perception of racial bias in OCSO's traffic stops as part of its participation in the NBC operation was well-founded. In the course of collaboration with USBP, OCSO deputies called USBP on at least a dozen separate occasions during a traffic stop. OCSO deputies conducted pretextual traffic stops of Latino drivers during which officers engaged in unlawful conduct, such as holding drivers far longer than necessary to issue a traffic ticket in order to give USBP time to arrive, or questioning passengers and/or searching cars without the requisite degree of probable cause. Sometimes their racial animus was more on display, such as during one call, where OCSO deputy remarked to a USBP agent, "[y]ou should be forced to speak English when you come here."[11] The same agent added, "[w]e couldn't even force them to get the Covid

[11] Michelle Breidenbach, *Videos show questionable tactics Oswego sheriff's deputies used to aid Trump's migrant hunt*, The Post-Standard (Syracuse, N.Y.), June 24, 2026, https://www.syracuse.com/news/2026/06/videos-show-questionable-tactics-oswego-sheriffs-deputies-used-to-aid-trumps-migrant-hunt.html&subscribed=auth0%7C65d5129fde8ffdcfe56fca8d.

shot, but we could force our own people."[12] On information and belief, OCSO did not engage in any pretextual traffic stops of white drivers in furtherance of its participation in the NBC operation.

173. The September 5 press release also stated that the OCSO "did not release these details sooner to protect the integrity of the ongoing multi-jurisdictional case." By its own account, then, the traffic stops were not routine traffic enforcement but a component of a coordinated federal operation that culminated in the NBC Dragnet on September 4, 2025.

**Individual Plaintiffs' Allegations**

**Pedro Rojas**

174. Mr. Rojas was working on Line 2 when agents commanded him and his coworkers to go the breakroom. Mr. Rojas felt he had no option but to comply.

175. Mr. Rojas was detained in the breakroom with dozens of other workers. He stood in the back of the breakroom with many of his colleagues where he was guarded by multiple officers.

176. Eventually, agents directed the group of workers in the breakroom to self-identify as U.S. citizens or noncitizens authorized to work. The initial instruction to self-identify as a U.S. citizen did not register with Mr. Rojas as he was preoccupied with the chaos of the seizure and the degrading treatment he and his colleagues were receiving from officers.

177. After other NBC employees who identified as U.S. citizens or noncitizens authorized to work left the breakroom to go to a secondary screening area, officers instructed everyone remaining in the room to line up to one side. Mr. Rojas then approached the agents to speak with them about his status. However, instead of engaging with him, they directed him to

[12] Sammy Sussan and Liv Veazey, *Videos Show Upstate Cops Calling Border Patrol on Drivers*, New York Focus, May 7, 2026, https://nysfocus.com/2026/05/07/oswego-body-cam-video-border-patrol-traffic-stops

move to the side and wait in line for individualized questioning. When he attempted to advocate for himself, he was yelled at, touched, and threatened by HSI Special Agent Valentino and USBP Agent Brockway.

178. Only after harassing Mr. Rojas for some time did an agent finally address him. USBP Agent Di Bella approached Mr. Rojas and asked him where he was from. Mr. Rojas answered that he was from Puerto Rico and produced his REAL ID New York State Driver's License, which contained indicia of his U.S. citizenship. On information and belief, no white workers were required to show identification before being allowed to leave the breakroom.

179. USBP Agent Di Bella then escorted Mr. Rojas from the breakroom to the warehouse across the hall where he was required to stand in a line with other U.S. citizens who remained detained pending a secondary screening.

180. After waiting for approximately 15 minutes, Mr. Rojas reached the front of the line, where HSI Special Agent Valentino screened him. Mr. Rojas presented his Real ID New York State Driver's License to her and indicated that he did not speak English. HSI Special Agent Valentino then stopped writing and asked a male agent, "This one's clear right?," prompting the agent to confirm that Mr. Rojas stated he was Puerto Rican. HSI Special Agent Valentino did not request similar confirmation of any white workers. As Mr. Rojas awaited, the male agent teased him for not speaking English.

181. HSI Special Agent Valentino then used Mr. Rojas's identification to write down his personal information and also asked Mr. Rojas for his phone number, which Mr. Rojas provided. Only after Mr. Rojas gave this information did HSI Special Agent Valentino call out for an escort, who led Mr. Rojas out of the plant. Only upon being escorted to the parking lot was Mr. Rojas free to leave.

**Maribel Lopez Martinez**

182. Ms. Lopez Martinez was working on Line 2 when agents commanded her to go to the breakroom. Given the agents' show of force and tone, Ms. Lopez Martinez did not feel free to ignore their orders.

183. After agents swept through the factory, Ms. Lopez Martinez was detained in the breakroom with at least seventy other NBC employees. At the time, Ms. Lopez Martinez had a pending asylum appeal before the BIA, a valid EAD, and a letter from her attorney at the Cornell Law School's Immigration Clinic. While she hoped this would protect her from arrest and detention, she immediately tried to call her attorney but was unable to reach her.

184. Agents standing outside the breakroom directed the group of workers inside to self-identify as U.S. citizens or noncitizens authorized to work. Ms. Lopez Martinez gathered her documents and walked to an agent standing in the door frame to show him her documents, including her EAD. Ms. Lopez Martinez did not believe that she had any choice but to comply with the agents' demands given their aggression, blocking of the exits, and display of force and weaponry.

185. The agents then directed Ms. Lopez Martinez across the hall to the warehouse, where she found many of her colleagues, several of whom were U.S. citizens, anxiously waiting. Ms. Lopez Martinez then joined a line of her coworkers who were waiting to speak with and be examined by agents.

186. After around twenty-five minutes of waiting, Ms. Lopez Martinez finally reached the front of the line. She then showed a female IRS-CI Agent her valid EAD and social security card, prompting the agent to ask a male HSI Agent to verify her documents.

187. Ms. Lopez Martinez also provided the female IRS-CI agent with the letter from her attorney. The letter stated that Ms. Lopez Martinez had a pending asylum appeal before the BIA,

did not have a final removal order, and could not be removed; and it instructed the agent to contact her lawyer immediately if Ms. Lopez Martinez was detained. In addition to the letter, Ms. Lopez Martinez gave the agent a copy of her EOIR-27 document reflecting her attorney of record and a copy of her EOIR Case Portal page showing her pending appeal. However, the agents disregarded the significance of the letter and the supporting documents.

188. Meanwhile, the male HSI agent, along with another male agent, acknowledged that her EAD was valid but struggled to check Ms. Lopez Martinez's documents for further information on account of technological issues. Accordingly, the agents enlisted the help of Border Patrol Agent Burrell, who collected the EAD and social security card and attempted to verify them himself.

189. As this was occurring, Ms. Lopez Martinez continued to be guarded by agents. While she was waiting, Ms. Lopez Martinez received a call from her attorney and attempted to hand her cell phone to the first male HSI agent so that he could speak with her lawyer, but the agent responded by saying, "No," and turned off his body-camera.

190. Ms. Lopez Martinez told an agent that she had a two-year-old son, but the agent ignored her.

191. Ms. Lopez Martinez was then frisked by a female USBP Agent and told to remove items of clothing. However, there was no basis to believe that Ms. Lopez Martinez possessed any weapons or contraband or posed any threat to officer safety.

192. Afterwards, the agent directed Ms. Lopez Martinez to join a group of her colleagues and wait, evidencing that the agents intended to arrest and detain her. Ms. Lopez Martinez was in shock because she could not understand why this was happening. Ms. Lopez Martinez, along with a group of her coworkers, were then led outside of the factory by multiple agents.

193. Once she was outside the factory, Ms. Lopez Martinez attempted to call her attorney again. But when an agent saw her on her phone, he told her she could not use it and confiscated it. The agents then proceeded to zip-tie her wrists. While she waited, Ms. Lopez Martinez noticed agents laughing at the detainees and congratulating each other.

194. Before placing her in the van, the agents did not ask her any further questions about her immigration status or family ties, including whether she had U.S. citizen relatives or children whose care she needed to arrange.

195. At no point did Ms. Lopez Martinez consent to this detention, nor did she feel free to leave given the agents' orders, monitoring, and weapons. Nor did the agents have individualized reasonable suspicion to continue detaining Ms. Lopez Martinez, as she had provided the agents with evidence that she was not removable given her pending appeal and that she had legal authorization to work. DHS agents also never inquired into Ms. Lopez Martinez's risk of flight, such as her family ties, including whether she had United States citizen relatives or children whose care she needed to arrange. In fact, Ms. Lopez Martinez affirmatively provided the agents with evidence that she did not present such a risk by advising them of her pending case and U.S. citizen family.

196. Ms. Lopez Martinez was then transported in a van with some coworkers to Oswego Station, where she remained until the next morning. Upon arriving, she and her coworkers were placed in a small, crowded, dirty room. Because there were no seats or beds in the room, they had no choice but to sit on the filthy floor. They only had access to an open toilet in the center of the room and thus, had no privacy when using the bathroom.

197. While they waited in the room, USBP agents called Ms. Lopez Martinez and her coworkers one by one and escorted them to another room to review their paperwork and

immigration status. Although Ms. Lopez Martinez tried to explain her pending case and provided them with her documents, and agents pulled up her electronic immigration history on the computer, they informed her that she would be transferred soon and likely be quickly deported back to her home country.

198. At this point, Ms. Lopez Martinez again informed the agents that she had a U.S. citizen son who was only two years old, prompting one of the agents to inquire as to where he was. When she informed him that her son was being looked after, he indicated that it was good her son was not alone as he may have otherwise been placed into the foster care system. Ms. Lopez Martinez was prohibited from contacting her family or her attorney and was repeatedly pressured to sign paperwork in English that she could not understand.

199. Early the next morning, Ms. Lopez Martinez and others were taken from Oswego Station and flown and transported to a USBP station in McAllen, Texas ("McAllen Station").

200. While this was occurring, Ms. Lopez Martinez's attorney was desperately trying to locate and speak with her. Ms. Lopez Martinez's attorney repeatedly called Oswego Station throughout the day of the dragnet in search of her, but was falsely told that no immigration detainees were being held at the station.

201. Ms. Lopez Martinez was held in USBP custody at the McAllen Station until Sunday, September 7, 2025. While detained, she was permitted to make only one phone call. Forced to choose between reaching her attorney and checking on her two-year-old son, who had been separated from her without warning, she called her family.

202. In the early morning of September 7, 2025, Ms. Lopez Martinez was woken up, shackled at the wrists, waist, and ankles, and escorted to a bus. Only once on the bus was she

informed that she was being deported. She was then loaded onto a plane and flown back to Guatemala.

203. Throughout this period, Ms. Lopez Martinez repeatedly refused to sign any paperwork. At no time preceding or during her arrest and detention was Ms. Lopez Martinez informed why she was being held, presented with an administrative or judicial warrant, asked questions pertaining to her flight risk, or issued a final removal order.

204. Ms. Lopez Martinez was terrified to return to Guatemala, which she had originally fled to escape her brutal and abusive partner—this was a basis for her asylum claim.

205. Ms. Lopez Martinez stayed in Guatemala for a total of two months and seven days. Throughout this time, her emotional and psychological wellbeing severely suffered. She had extreme anxiety both from being back in Guatemala, where her prior trauma resurfaced, and from being separated from her son, who remained in the United States. Ms. Lopez Martinez's two-year-old son likewise struggled. During her time in Guatemala, Ms. Lopez Martinez's distress was compounded by her knowledge that her son was suffering and that he constantly cried for her.

206. During this period, Ms. Lopez Martinez's attorneys from Cornell worked tirelessly to correct her unlawful deportation. Indeed, ICE officials conceded to Ms. Lopez Martinez's attorneys that she had been "inadvertently" deported.

207. After acknowledging its mistake in deporting Ms. Lopez Martinez, on November 13, 2025, the government flew her back to the United States. Upon her return, she was taken to the ICE detention facility ERO El Paso Camp East Montana, in El Paso, Texas. Ms. Lopez Martinez was relieved to be back to the United States and hoped that she would be reunited with her family. However, she was held in this detention center in Texas for over three more months during the pendency of her BIA appeal and beyond.

208. Prior to leaving for the United States, Ms. Lopez Martinez's attorneys advocated to have Ms. Lopez Martinez returned to the New York region and ultimately released to her family. However, a Field Officer at the Buffalo Federal Detention Facility refused to secure this request and instead advised that Ms. Lopez Martinez could file a parole request once she returned to the United States. This refusal was contrary to what an unnamed federal officer told Ms. Lopez Martinez in Guatemala—i.e., that she would be initially taken to Texas, but shortly thereafter transferred to Buffalo and ultimately released from custody.

209. Despite filing a parole request, requesting a bond hearing, and filing a habeas petition, Ms. Lopez Martinez was prevented from leaving the facility. As a result, Ms. Lopez Martinez remained at the ERO El Paso Camp East Montana through the pendency of her BIA appeal. At no time was Ms. Lopez offered the opportunity to reunite with her son. In fact, whenever Ms. Lopez Martinez raised her desire to be reunited with her son, agents informed her that it was not possible.

210. The conditions at Camp East Montana were horrific and further deteriorated Ms. Lopez Martinez's mental and physical state. She was held in a crowded tent that was extremely dirty, unhygienic, uncomfortable, and dusty. The food provided was often inedible, and the water smelled foul. Consequently, Ms. Lopez Martinez was malnourished and often had stomach pain and indigestion given the poor quality of the food. The agents were cruel and frequently criticized her and others for their lack of gratitude. They also failed to intervene and offer protection when Ms. Lopez Martinez faced abuse from other inmates. As a result of these horrendous conditions and the continued separation from her son, Ms. Lopez Martinez's health declined.

211. Eventually, when the BIA denied Ms. Lopez Martinez's appeal, she decided not to file a petition for review. This decision was motivated, at least in part, by her inability to tolerate

being apart from her son and living under these inhumane detention conditions. Likewise, Ms. Lopez Martinez knew that her son, who remained in New York, was struggling severely from being separated for so long at such a critical time in his development.

212. Ms. Lopez Martinez was deported to Guatemala in February 2026.

213. After Ms. Lopez Martinez was deported, her two-year-old U.S. citizen son later joined her in Guatemala. By the time they were finally reunited, they had been separated for nearly six months.

**Eddie Ramirez Perez**

214. In the officers' initial dragnet sweep of the factory, Mr. Ramirez Perez was ordered to the breakroom, where he was held against his will along with many of his coworkers. The breakroom at the time was guarded by at least one male USBP Agent standing near the door.

215. At the time, Mr. Ramirez Perez had a pending cancellation of removal appeal before the BIA, a valid EAD, and a retained immigration attorney. He was fighting to stay in the United States so he could continue supporting and building a life with his U.S. citizen wife, Mrs. Ramirez-Abrams, and their two U.S. citizen minor sons. He hoped and expected that his deep community ties and case status would protect him from arrest and detention.

216. Mrs. Ramirez-Abrams was also working at NBC that day. Mrs. Ramirez-Abrams was in the parking lot on break at the time agents entered the premises and began conducting the dragnet. However, given her appearance as a white woman, she was neither detained nor required to provide documentation of her citizenship.

217. At one point, Mrs. Ramirez-Abrams was escorted inside the plant at her request to obtain her belongings from the breakroom. Upon entering the breakroom, she was able to see and make eye contact with her husband who was detained there. As she was visibly distraught, Mr.

Ramirez Perez tried to reassure her that everything would be okay. This was the last moment they saw one another in-person.

218. Shortly thereafter, agents standing outside the breakroom directed the group of workers inside to self-identify as U.S. citizens or noncitizens authorized to work. Feeling that he had no other option, Mr. Ramirez Perez approached a male USBP Agent standing in the doorway and showed him his valid EAD. Throughout this entire time, Mr. Ramirez Perez did not feel free to leave or remain silent in light of the officers' demands, blocked exits, and display of force and weaponry.

219. Notwithstanding his valid EAD, Mr. Ramirez Perez was then escorted across the hall to the warehouse, where he found many of his colleagues anxiously waiting, and stood beside them in line as directed. Shortly thereafter, USBP Agent Di Bella approached him and began asking him questions, prompting Mr. Ramirez Perez to pull out his EAD and other documents. However, in response, without even examining the document, USBP Agent Di Bella said, the permit "no dice nada [doesn't say anything]."

220. As Mr. Ramirez Perez attempted to explain more about his situation, USBP Agent Di Bella interrupted him and indicated that this documentation was not sufficient before ending the interrogation.

221. Agents then proceeded to shuttle Mr. Ramirez Perez and others back and forth between the warehouse and breakroom. Throughout this period, Mr. Ramirez Perez showed his valid EAD and mentioned his open immigration case to multiple agents.

222. While Mr. Ramirez Perez was being ordered around the factory, he attempted to make a phone call to his immigration lawyer. However, a male agent approached him and demanded he drop the call. Mr. Ramirez Perez complied with the order. Another male agent then

approached Mr. Ramirez Perez with a plastic bag and instructed him to place his belongings and phone in the bag. When Mr. Ramirez Perez attempted to turn off his phone, this same agent returned to yell at him for using his phone and not following instructions.

223. During this period, agents frisked Mr. Ramirez Perez at least twice. They also directed him and other men to remove their belts and shoelaces.

224. Even after the men Mr. Ramirez Perez was standing with were led out of the factory, he continued to be held inside and guarded by a USBP agent with a rifle. At one point, when Mr. Ramirez Perez was escorted into the hallway, he approached a group of his white colleagues and requested that one of them call his wife to give her an update. However, when the colleague pulled out her phone, the USBP Agent with the rifle guarding Mr. Ramirez Perez demanded she put it away, and the colleague complied with the order. On information and belief, agents blocked this phone call and others made by or on behalf of detainees in the factory to prevent detainees from accessing legal counsel, which could have had the effect of reducing the number of Latino immigrants arrested.

225. After being moved between rooms, isolated, and carefully guarded by armed officers, Mr. Ramirez Perez was led out of the factory, arrested, and prepared to be taken into custody. Agents arrested Mr. Ramirez Perez even though they had neither a warrant nor any evidence that he was a flight risk. At no point did any agent inquire about Mr. Ramirez Perez's flight risk, including his family ties, or ask him whether he had children whose care needed to be arranged.

226. At no point did Mr. Ramirez Perez consent to this detention, and Mr. Ramirez Perez did not feel free to leave given the agents' orders, monitoring, and weapons. Nor did the agents have individualized reasonable suspicion to continue detaining Mr. Ramirez Perez as he had

provided the agents with evidence that he was not removable given his pending appeal and his legal authorization to work. The agents also never inquired into Mr. Ramirez Perez's risk of flight such as his family ties, including whether he had United States citizen relatives or children whose care he needed to arrange. In fact, Mr. Ramirez Perez affirmatively provided the agents with evidence that he did not present such a risk by advising them of his pending case and family.

227. Mr. Ramirez Perez was then taken to Oswego Station and placed in a small cell by himself without access to any food. Agents also denied Mr. Ramirez Perez's requests to call his family and attorney.

228. Later that evening, Mr. Ramirez Perez was taken to the Buffalo Federal Detention Facility ("BFDF"), where he was placed in a large cell with other noncitizens. He was only offered a small bottle of water and a sleeping bag to sleep on the floor. Because he had not eaten since his arrest in the morning, he was hungry and asked for food. However, he was only provided with a small package of crackers. He also was denied the opportunity to call his family or attorney. While he was detained in Buffalo, Mr. Ramirez Perez was provided with voluntary departure forms in English and told to sign. Mr. Ramirez Perez refused to sign any papers without speaking to his immigration attorney.

229. Meanwhile, Mr. Ramirez Perez's family and attorney had no idea where he was. They called Oswego Station, but agents refused to confirm whether he was there or provide any further information.

230. In the early morning of September 5, 2025, Mr. Ramirez Perez was woken up and taken from BFDF and flown and transported to the McAllen Station in Texas, where he arrived later that afternoon.

231. Mr. Ramirez Perez was held in USBP custody at the McAllen Station until Sunday, September 7, 2025. While he was detained, he was only permitted to make one call, forcing him to choose contacting his family over calling his attorney. Although the agent stated that Mr. Ramirez Perez would be given five minutes for the phone call, the call was terminated after only two minutes.

232. In the early morning of Sunday, September 7, 2025, Mr. Ramirez Perez was woken up, shackled, and flown to Guatemala. At no point prior was Mr. Ramirez Perez informed that he would be deported or provided with the reasons for his deportation. He did not have a final order of removal, did not accept voluntary departure, and was never offered the opportunity to be reunited with his family.

233. To this day, Mr. Ramirez Perez's cancellation of removal case remains open. Further, at the time of his unlawful deportation, Mrs. Ramirez-Abrams had filed an I-130 petition on his behalf, which has since been approved.

234. Mr. Ramirez Perez is a dependable and supportive husband and father. He is an indispensable economic pillar of his family. He has no criminal record. He works and pays taxes. He has pursued and will continue to pursue his cancellation of removal case diligently through the proper legal channels.

235. Mr. Ramirez Perez and his family are suffering severe emotional and economic hardship in his absence. His two boys dearly miss their father and are having emotional and behavioral difficulties in his absence. Without Mr. Ramirez Perez, Mrs. Ramirez-Abrams is forced to single-parent two minor boys with developmental challenges while working full-time and facing her own mental health struggles and emotional suffering on account of being separated from her beloved husband.

236. Every day Mr. Ramirez Perez is separated from his family, he, Mrs. Ramirez-Abrams, and their minor U.S. citizen children are each irreparably harmed.

**Argentina Juarez-Lopez**

237. On the morning of September 4, 2025, Ms. Juarez-Lopez was at her workstation in the NBC production area, operating a machine that packs bars.

238. At approximately 9:15 a.m., Ms. Juarez-Lopez heard a commotion and left her station and encountered an officer walking toward her wearing military-style body armor. The agent told her to stop. She turned and walked in another direction, where she was met by a second agent who directed her and nearby coworkers toward the breakroom. She followed his instructions.

239. When Ms. Juarez-Lopez arrived at the breakroom, approximately forty to fifty employees were already inside. Agents stood at both doors to prevent anyone from leaving. The room was chaotic, crowded, and hot. Agents yelled at workers to sit down and stay where they were.

240. Shortly thereafter, agents standing outside the breakroom directed the group of workers to self-identify as U.S. citizens or noncitizens authorized to work. After these individuals exited the breakroom, agents directed Ms. Juarez-Lopez and her colleagues in Spanish to go to the left side of the room and form a line to be addressed one by one. Ms. Juarez-Lopez complied and remained silent.

241. At around 9:52 a.m., Ms. Juarez-Lopez reached the front of the line and was approached by USBP Agent Di Bella. The interview lasted no more than 10 seconds. Agent Di Bella asked, in Spanish, what country she was from. Ms. Juarez-Lopez responded: "Quiero un abogado" (I want a lawyer). Agent Di Bella asked a second question. Ms. Juarez-Lopez responded: "Necesito un abogado" (I need a lawyer). After this, Agent Di Bella directed her to the right side

of the breakroom along with the group designated for arrest and transport. That was the entirety of Ms. Juarez-Lopez's interactions with any officer in the breakroom that day.

242. At no point had Ms. Juarez-Lopez told any agent her name, her country of birth, or her immigration status. At no point had she admitted to being a Guatemalan national or in the country unlawfully. She asked for a lawyer twice and was ignored both times.

243. Ms. Juarez-Lopez remained in the breakroom for at least an hour where she was searched by agents and told to turn off her cell phone before being escorted by USBP Agent Burrell to the entrance of the factory with several female coworkers. No one told her where she was being taken. She was placed in a transport van and driven to Oswego Station.

244. At Oswego Station, Ms. Juarez-Lopez was faced with humiliating and difficult conditions. When she needed to use the restroom, she was forced to utilize a metal toilet in the middle of a large cell that had no door or privacy screen and was in full view of her coworkers. At this time, agents still did not have any information about her. They later called her to a separate area, where for the first time, they obtained her name and date of birth, photographed her, and took her fingerprints.

245. After this, she was placed in a very small cell with one other woman. They were given blankets and foam mattresses but there was not enough space for them to fully lie down and she was not allowed to leave the cell at any point. She remained there from September 4 through September 7—a total of three days. During that time, she had no idea where she was, where she was going to be taken, or what would happen to her.

246. On September 7, 2025, Ms. Juarez-Lopez was moved to the larger cell she was initially held in. There she met several women who were picked up from NBC and had been

separated from their young children during the raid. These women had not been permitted to call anyone, and like her, had no idea what was happening to them.

247. On September 8, 2025, four days after her arrest, Ms. Juarez-Lopez was brought to federal court and told for the first time that she was being charged with a crime: illegal reentry into the United States in violation of 8 U.S.C. § 1326(a). Two government documents submitted in support of that charge contained representations about Ms. Juarez-Lopez that had no basis in fact. USBP Agent Foster Rubinstein submitted an affidavit in support of the criminal complaint stating that "*[w]hile on-scene*, [a]gents detennined [sic] that [Ms. Juarez-Lopez] is a citizen of Guatemala and is present in the United States illegally." *Juarez-Lopez*, 813 F. Supp. 3d at 338. The DHS report prepared following her arrest stated that Ms. Juarez-Lopez "was encountered during the operation"; "was questioned as to her citizenship and nationality"; and "freely admitted to being in the United States illegally." *Id.* The representations in both Agent Rubinstein's affidavit and the DHS report were false. The only statements Ms. Juarez-Lopez had made to any agent were that she wanted a lawyer and that she needed a lawyer.

248. Ms. Juarez-Lopez moved to suppress all evidence obtained as a result of her unlawful arrest. The court granted the motion on December 18, 2025. The court found that at the time of Ms. Juarez-Lopez's arrest, the arresting agent "did not know Defendant's name, where she was born, or any other biographical information. All he knew before the interview was that she did not self-identify as a U.S. citizen or authorized worker – in other words, that she had remained silent." The court found that the government had "presented no evidence to refute Defendant's assertion that agents at the factory questioned her once (for ten seconds), during which she stated only that she wanted a lawyer," and that agents had arrested Ms. Juarez-Lopez "based on an admission that, evidently, never occurred," and in a manner that was "at best, grossly negligent."

Ms. Juarez-Lopez's statements, fingerprints, photograph, any report of investigation, and the immigration file linked to her fingerprints were suppressed as the fruit of her unlawful arrest and her criminal charge was dismissed on December 29, 2025.

249. Argentina returned to Guatemala on January 12, 2026.

## CLASS ACTION ALLEGATIONS

250. Plaintiffs Pedro Rojas, Eddie Ramirez Perez, Maribel Lopez Martinez, and Argentina Juarez-Lopez (collectively, "Plaintiffs") bring a claim under Federal Rule of Civil Procedure 23(b)(1) and 23(b)(3) on behalf of themselves and a class of all other persons similarly situated.

251. Plaintiffs seek to represent the following class: All persons who were subject to a suspicion-less seizure and non-consensual questioning about their citizenship status at the Nutrition Bar Confectioners premises in Cato, New York on the morning of September 4, 2025.

252. The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable. There are approximately 100 members of the proposed class.

253. The class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). The lawsuit raises numerous questions of fact common to members of the proposed class because the members of the class were all seized and subjected to non-consensual questioning about their citizenship status by Defendants in the same dragnet operation without any individualized suspicion on the morning of September 4, 2025, at NBC's premises in Cato, New York. The lawsuit raises numerous questions of law common to members of the proposed class, including whether that suspicion-less seizure and non-consensual questioning violated the Fourth Amendment to the U.S. Constitution.

254. The class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs' claims are typical of the claims of the class. Plaintiffs and the proposed class members were all seized and subjected to non-consensual questioning by Defendants at the same time and in the same dragnet operation on the morning of September 4, 2025, at the NBC plant in Cato, New York. Plaintiffs and the proposed class also share the same legal claims, which assert the same rights under the Fourth Amendment to the United States Constitution.

255. Plaintiffs' counsel are experienced in class action, civil rights, and immigrants' rights litigation. Plaintiffs' counsel have the requisite level of expertise to adequately prosecute this case on behalf of the named plaintiffs and the proposed class. Plaintiffs' counsel will fairly and adequately represent the interests of each class member.

256. The proposed class meets the adequacy requirement of Federal Rule of Civil Procedure 23(a)(4). As putative class representatives, Plaintiffs have committed to fairly and adequately representing the interests of the class.

257. The proposed class can be maintained under Federal Rule of Civil Procedure 23(b)(1) because adjudications as to the legality of the suspicion-less seizure and non-consensual questioning or the conspiracy at issue with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

258. The proposed class can also be maintained under Federal Rule of Civil Procedure 23(b)(3). The proposed class satisfies Rule 23(b)(3)'s predominance requirement because questions of law or fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. With respect to predominance, specifically, questions such as whether the suspicion-

less seizure and non-consensual questioning of workers at NBC violated the Fourth Amendment; whether Defendants chose to undertake the dragnet at NBC in part because of the factory's Latino workforce; and whether Defendants engaged in a conspiracy under Sections 1985(3) will drive resolution of class members' claims. None of these questions turn on an individual class member's fact-specific circumstances; rather, they are capable of resolution as to all class members with one stroke. Further, adjudicating those questions at once is far more efficient and fair to the parties than one hundred separate adjudications on the same subject.

## JURISDICTION AND VENUE

259. This Court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(1),(3)-(4); and 5 U.S.C. §§ 702 and 706.

260. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district and because numerous Defendants maintain offices and/or reside in this district.

## CLAIMS

### FIRST CAUSE OF ACTION

Conspiracy to Deprive Individuals of Equal Protection in Violation of 42 U.S.C. § 1985(3)

*On behalf of all Plaintiffs and the putative class against Defendants McCoy, Valentino, Regan D., Donnell, Bell, Burrell, Di Bella, Brockway, Dennis LNU, Geer, Hilton, Schenck, and Doe Defendants*

261. Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

262. Defendants McCoy, Valentino, Regan D., Donnell, Bell, Burrell, Di Bella, Brockway, Dennis LNU, Geer, Hilton, Schenck, and Doe Defendants conspired with each other by entering into a mutual agreement to exceed the scope of two search warrants issued by Magistrate Judge Dancks, in order to conduct a mass seizure for the purpose of engaging in non-

consensual questioning about immigration status and to institute an immigration dragnet at a factory employing a large number of Latino immigrant workers, based in part on the workers' actual or perceived Latino ethnicity, national origin from Latin American countries, and/or alienage status, in violation of Plaintiffs' rights to equal protection under the law.

263. These Defendants' agreement, and their overt acts in furtherance of the conspiracy, were motivated by animus against Plaintiffs due to their actual or perceived Latino ethnicity, or association with people of actual or perceived Latino ethnicity, national origin from Latin American countries, and/or alienage status.

264. In furtherance of this conspiracy, these Defendants committed overt acts including but not limited to, conducting a suspicion-less mass seizure for the purpose of engaging in non-consensual questioning of NBC's predominantly Latino workforce without individualized suspicion as to any worker seized; committing a knowing and/or intentional violation of the scope of the search warrants issued; only releasing U.S. citizens and lawful permanent residents after forcing them to verify lawful status; subjecting Plaintiffs Mr. Ramirez Perez, Ms. Lopez Martinez, and Ms. Juarez-Lopez and other NBC workers to arrest without probable cause; and denying Plaintiffs Mr. Ramirez Perez, Ms. Lopez Martinez, Ms. Juarez-Lopez, and other arrested NBC workers timely access to counsel or the opportunity to speak with their families.

265. As a result of the conspiracy, these Defendants deprived Plaintiffs and the class of rights and privileges secured by the Constitution, including the equal protection of the laws.

266. Defendants are jointly and severally liable for the harm caused.

## SECOND CAUSE OF ACTION

Unreasonable Suspicion-less Seizure in Violation of the Fourth Amendment to the United States Constitution through the New York State Bivens Act

*On behalf of all Plaintiffs and the putative class against Defendants McCoy, Valentino, Regan D., Donnell, Bell, Burrell, Di Bella, Brockway, Dennis LNU, Geer, Hilton, Schenck, and Doe Defendants*

267. Plaintiffs reallege all preceding paragraphs as if fully set forth herein. Defendants McCoy, Valentino, Regan D., Donnell, Bell, Burrell, Di Bella, Brockway, Dennis LNU, Geer, Hilton, Schenck, and Doe Defendants are sued under the Fourth Amendment to the United States Constitution and the New York State Bivens Act, N.Y. Civ. Rights Law Art. 8-A.

268. These Defendants planned and executed a mass seizure of the NBC workforce, including Plaintiffs, and conducted non-consensual questioning of them concerning their citizenship without individualized reasonable suspicion, probable cause, or other lawful authority in violation of the Fourth Amendment.

269. These Defendants' seizure of Plaintiffs occurred during the execution of two warrants, neither of which authorized the seizure of any person. The Rule 41 criminal search warrant authorized only the search for documents and equipment related to the alleged violations of the NBC employers. The administrative *Blackie's* warrant permitted solely "systematic consensual questioning" of NBC employees—which the government represented to the issuing magistrate judge would be voluntary. The warrants issued by the magistrate judge did not authorize the seizure of any person for non-consensual questioning.

270. These Defendants knew and/or deliberately disregarded the limited authority that the government sought and received in the two warrants.

271. These Defendants nevertheless ordered all workers to the NBC breakroom, stationed armed agents at every exit to prevent anyone from leaving the factory, and subjected workers to non-consensual questioning about their immigration status without individualized

suspicion as to any worker. The detention was prolonged and carried out through aggressive and militarized tactics.

272. As a result of these Defendants' unlawful seizure, Plaintiffs suffered deprivations of liberty, physical and emotional distress, family separation, loss of employment, and other harms.

273. These Defendants are jointly and severally liable for the harm caused.

## THIRD CAUSE OF ACTION

Unreasonable Suspicion-less Seizure in Violation of the Fourth Amendment to the United States Constitution through *Bivens v. Six Unknown Named Federal Agents*

*On behalf of all Plaintiffs and the putative class against Defendants McCoy, Valentino, Regan D., Donnell, Bell, Burrell, Di Bella, Brockway, Dennis LNU, Geer, Hilton, Schenck, and Doe Defendants*

274. Plaintiffs reallege all preceding paragraphs as if fully set forth herein. Defendants McCoy, Valentino, Regan D., Donnell, Bell, Burrell, Di Bella, Brockway, Dennis LNU, Geer, Hilton, Schenck, and Doe Defendants are sued under the Fourth Amendment to the United States Constitution through the *Bivens v. Six Unknown Named Federal Agents*, 403 U.S. 388 (1971).

275. These Defendants seized Plaintiffs and conducted non-consensual questioning of them concerning their citizenship without individualized reasonable suspicion, probable cause, or other lawful authority in violation of the Fourth Amendment.

276. These Defendants' seizure of Plaintiffs occurred during the execution of two warrants, neither of which authorized the seizure of any person. The Rule 41 criminal search warrant authorized only the search for documents and equipment related to the alleged violations of the NBC employers. The administrative *Blackie's* warrant permitted solely "systematic consensual questioning" of NBC employees—which the government represented to the issuing magistrate judge would be voluntary. The warrants issued by the magistrate judge did not authorize the seizure of any person for non-consensual questioning.

277. These Defendants knew and/or deliberately disregarded the limited authority that the government sought and received in the two warrants.

278. These Defendants nevertheless ordered all workers to the NBC breakroom, stationed armed agents at every exit to prevent departure, and subjected numerous workers to non-consensual questioning about their immigration status without individualized suspicion as to any worker. The detention was prolonged and carried out through aggressive and militarized tactics.

279. As a result of these Defendants' unlawful seizure, Plaintiffs suffered deprivations of liberty, physical and emotional distress, family separation, loss of employment, and other harms.

280. These Defendants are jointly and severally liable for the harm caused.

## FOURTH CAUSE OF ACTION

Arrest without Probable Cause in Violation of the Fourth Amendment to the United States Constitution through the New York State Bivens Act

*On behalf of Plaintiffs Ramirez Perez, Lopez Martinez, and Juarez-Lopez against Defendants McCoy, Valentino, Burrell, Di Bella, Brockway, Hutchings, Rodriguez, Mulzoff, E. Lorenzo, and J. Lorenzo, and Doe Defendants.*

281. Plaintiffs reallege all preceding paragraphs as if fully set forth herein. Defendants McCoy, Valentino, Burrell, Di Bella, Brockway, Hutchings, Rodriguez, Mulzoff, E. Lorenzo, and J. Lorenzo, and Doe Defendants are sued under the Fourth Amendment to the United States Constitution through the New York State Bivens Act, N.Y. Civ. Rights Law Art. 8-A.

282. Defendants arrested Plaintiffs Mr. Ramirez Perez, Ms. Lopez Martinez, and Ms. Juarez-Lopez without probable cause, individualized suspicion, a judicial arrest warrant, or other lawful authority, in violation of the Fourth Amendment.

283. Neither of the two warrants Defendants executed authorized the arrest of any NBC worker. The Rule 41 warrant authorized only a search for documents and equipment, and the administrative warrant allowed only consensual questioning.

284. Defendants nevertheless used the warrants as a pretext to conduct a mass immigration dragnet, detain Plaintiffs, subject them to non-consensual questioning about their citizenship and immigration status, and place them under arrest.

285. At the time of Plaintiffs' arrests, Defendants lacked probable cause to believe that Plaintiffs had committed any criminal offense or were unlawfully present in the United States. Any information concerning Plaintiffs' immigration status was obtained only through the unlawful mass seizure and non-consensual interrogation that preceded their arrests. Plaintiffs' mere presence at NBC, Latino ethnicity, and/or actual or perceived foreign birth did not provide the requisite probable cause to arrest them.

286. As a result of Defendants' unlawful arrests, Plaintiffs were deprived of their liberty, detained and separated from their families and minor children, denied access to counsel and family, subjected to fear, humiliation, emotional distress, and other harms.

287. Defendants are jointly and severally liable for the harm caused.

## FIFTH CAUSE OF ACTION

Arrest without Probable Cause in Violation of the Fourth Amendment to the United States Constitution through *Bivens v. Six Unknown Named Agents*

*On behalf of Plaintiffs Ramirez Perez, Lopez Martinez, and Juarez-Lopez against Defendants McCoy, Valentino, Burrell, Di Bella, Brockway, Hutchings, Rodriguez, Mulzoff, E. Lorenzo, and J. Lorenzo, and Doe Defendants.*

288. Plaintiffs reallege all preceding paragraphs as if fully set forth herein. Defendants McCoy, Valentino, Burrell, Di Bella, Brockway, Hutchings, Rodriguez, Mulzoff, E. Lorenzo, and J. Lorenzo, and Doe Defendants are sued under the Fourth Amendment to the United States Constitution through the *Bivens v. Six Unknown Named Federal Agents*, 403 U.S. 388 (1971).

289. These Defendants arrested Plaintiffs Mr. Ramirez Perez, Ms. Lopez Martinez, and Ms. Juarez-Lopez without probable cause, individualized suspicion, a judicial arrest warrant, or other lawful authority, in violation of the Fourth Amendment.

290. Neither of the two warrants these Defendants executed authorized the arrest of any NBC worker. The Rule 41 warrant authorized only a search for documents and equipment, and the administrative warrant allowed only consensual questioning.

291. These Defendants nevertheless used the warrants as a pretext to conduct a mass immigration dragnet, detain these Plaintiffs, subject them to non-consensual questioning about their citizenship and immigration status, and place them under arrest.

292. At the time of these Plaintiffs' arrests, these Defendants lacked probable cause to believe that Plaintiffs had committed any criminal offense or were unlawfully present in the United States. Any information concerning these Plaintiffs' immigration status was obtained only through the unlawful mass seizure and non-consensual interrogation that preceded their arrests. These Plaintiffs' mere presence at NBC, Latino ethnicity, and/or actual or perceived foreign birth did not provide the requisite probable cause to arrest them.

293. As a result of these Defendants' unlawful arrests, these Plaintiffs were deprived of their liberty, detained and separated from their families and minor children, denied access to counsel and family, subjected to fear, humiliation, emotional distress, and other harms.

294. Defendants are jointly and severally liable for the harm caused.

**SIXTH CAUSE OF ACTION**

Detention without Due Process of Law in Violation of the Fifth Amendment to the United States Constitution through the New York State Bivens Act

*On behalf of Plaintiffs Ramirez Perez, Lopez Martinez, and Juarez-Lopez against Defendants McCoy, Valentino, Burrell, Di Bella, Brockway, Hutchings, Rodriguez, Mulzoff, E. Lorenzo, and J. Lorenzo, and Doe Defendants.*

295. Plaintiffs reallege all preceding paragraphs as if fully set forth herein. Defendants McCoy, Valentino, Burrell, Di Bella, Brockway, Hutchings, Rodriguez, Mulzoff, E. Lorenzo, and J. Lorenzo, and Doe Defendants are sued under the Fifth Amendment to the United States Constitution and the New York State Bivens Act, N.Y. Civ. Rights Law Art. 8-A.

296. These Defendants detained Plaintiffs Mr. Ramirez Perez, Ms. Lopez Martinez, and Ms. Juarez-Lopez without due process of law in violation of the Fifth Amendment.

297. After unlawfully seizing and arresting these Plaintiffs at NBC, these Defendants detained these Plaintiffs in federal and/or local custody without providing adequate notice of the basis for their detention, a meaningful opportunity to contest their detention, timely access to counsel, timely access to their family members, or a meaningful opportunity to seek release.

298. These Defendants knew and/or should have known that these Plaintiffs had significant liberty interests at stake, including interests in remaining free from unlawful detention, remaining with their families and minor children, accessing counsel, and pursuing available immigration relief. Defendants were informed at NBC yet deliberately dismissed notice that several of these Plaintiffs held valid EADs and had pending immigration proceedings.

299. These Defendants transported these Plaintiffs away from NBC and detained them in facilities thousands of miles away from their families, attorneys, and community support—before any of these Plaintiffs had an opportunity to challenge their detention. Defendants denied these Plaintiffs access to counsel throughout their arrest, processing, and transfer phases. Defendants pressured these Plaintiffs to sign voluntary departure documents without counsel and, in some instances, through coercion. These Defendants separated these Plaintiffs from their minor children and refused to allow these Plaintiffs to arrange care for children waiting at home or at

school for them. Defendants did not even allow these Plaintiffs to inform their loved ones they were being detained.

300. Plaintiffs Mr. Ramirez Perez, Ms. Lopez Martinez, and Ms. Juarez-Lopez suffered harm as a direct and proximate result of these Defendants' actions including but not limited to the violation of their constitutional rights, emotional distress, bodily injury, and economic loss.

301. These Defendants are jointly and severally liable for the harm caused.

## SEVENTH CAUSE OF ACTION

Detention without Due Process of Law in Violation of the Fifth Amendment to the United States Constitution through *Bivens v. Six Unknown Named Agents*

*On behalf of Plaintiffs Ramirez Perez, Lopez Martinez, and Juarez-Lopez against Defendants McCoy, Valentino, Burrell, Di Bella, Brockway, Hutchings, Rodriguez, Mulzoff, E. Lorenzo, and J. Lorenzo, and Doe Defendants*

302. Plaintiffs reallege all preceding paragraphs as if fully set forth herein. Defendants McCoy, Valentino, Burrell, Di Bella, Brockway, Hutchings, Rodriguez, Mulzoff, E. Lorenzo, and J. Lorenzo, and Doe Defendants are sued under the Fifth Amendment to the United States Constitution through the *Bivens v. Six Unknown Named Federal Agents*, 403 U.S. 388 (1971).

303. These Defendants detained Plaintiffs without due process of law in violation of the Fifth Amendment.

304. After unlawfully seizing and arresting Plaintiffs at NBC, these Defendants detained Plaintiffs in federal and/or local custody without providing adequate notice of the basis for their detention, a meaningful opportunity to contest their detention, timely access to counsel, timely access to their family members, or a meaningful opportunity to seek release.

305. These Defendants knew and/or should have known that Plaintiffs had significant liberty interests at stake, including interests in remaining free from unlawful detention, remaining with their families and minor children, accessing counsel, and pursuing available immigration

relief. These Defendants were informed at NBC that several Plaintiffs held valid work authorization and had pending immigration proceedings, and disregarded that information.

306. These Defendants transported Plaintiffs away from NBC and detained them in facilities thousands of miles away from their families, attorneys, and community support – before any Plaintiff had an opportunity to challenge their detention. These Defendants denied Plaintiffs access to counsel throughout their arrest, processing, and transfer phases. These Defendants pressured Plaintiffs to sign voluntary departure documents without counsel and, in some instances, through coercion. These Defendants separated Plaintiffs from their minor children and refused to allow Plaintiffs to arrange care for children waiting at home or at school for them. These Defendants did not even allow Plaintiffs to inform their loved ones they were being detained.

307. Plaintiffs suffered harm as a direct and proximate result of these Defendants' actions including but not limited to the violation of their constitutional rights, emotional distress, bodily injury, and economic loss.

308. These Defendants are jointly and severally liable for the harm caused.

## EIGHTH CAUSE OF ACTION

Wrongful Deportation in Violation of the Due Process Clause of the Fifth Amendment

*On behalf of Plaintiff Ramirez Perez against Defendants Mullin, Venturella, Brophy, and D'Amato*

309. Mr. Ramirez Perez repeats and re-alleges the previous factual and jurisdictional allegations in this complaint. Defendants Mullin, Venturella, Brophy, and D'Amato are sued in their official capacities under the Due Process Clause of the Fifth Amendment.

310. Defendants wrongfully deported Mr. Ramirez Perez in violation of the Due Process Clause of the Fifth Amendment. Noncitizens like Mr. Ramirez Perez may only be deported "after proceedings conforming to traditional standards of fairness encompassed in due process of law"

have concluded. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953). Mr. Ramirez Perez did not receive any such process.

311. Defendants' summary removal of Mr. Ramirez Perez less than 72 hours after his arrest on September 4, 2025, failed to comply with the INA and its implementing regulations and directly led to the erroneous deprivation of his liberty interests in violation of his Fifth Amendment due process rights.

312. At the time of his wrongful deportation Mr. Ramirez Perez did not have—and to date still does not have—a final order of removal. Section 1231(a)(1)(B) of the INA provides that the removal period for a noncitizen ordered removed cannot begin before an "order of removal becomes administratively final." Likewise, 8 C.F.R. § 1003.6(a), provides that a removal order shall not be executed while a timely BIA appeal is pending—as is the case for Mr. Ramirez Perez.

313. As a result of Defendants' wrongful deportation, Plaintiff remains separated from his U.S. citizen wife and children, is unable to participate in his pending cancellation of removal proceedings from within the United States, and continues to suffer ongoing harm.

## NINTH CAUSE OF ACTION

Wrongful Deportation Was Contrary to Law in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(D)

*On behalf of Plaintiff Ramirez Perez against Defendants Mullin, Venturella, Brophy, and D'Amato*

314. Mr. Ramirez Perez repeats and realleges the previous factual and jurisdictional allegations in this complaint. Defendants Mullin, Venturella, Brophy, and D'Amato are sued in their official capacities under the Administrative Procedure Act ("APA").

315. The APA, 5 U.S.C. § 706(2), prohibits federal agencies from taking any action that is "not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without

observance of procedure required by law." *Dep't of Com.*, 351 F. Supp. 3d at 628 (quoting 5 U.S.C. § 706(2) (A)-(D)).

316. Defendants' deportation of Plaintiff Ramirez Perez was contrary to law because Defendants lacked legal authority to deport him, acting in violation of his Due Process rights under the Fifth Amendment, *see* § 706(2)(B); in excess of 8 U.S.C. § 1231(a)(1)(A)-(B), *see* § 706(2)(C); not in accordance with 8 C.F.R. § 1003.6(a), *see* § 706(2)(B); and without observance of mandatory procedure, *see* § 706(2)(D).

317. The course of agency action that directly resulted in Defendants' deportation of Plaintiff Ramirez Perez, including his unlawful seizure, arrest, denial of access to counsel, and detention, was also contrary to the Constitution and laws of the United States.

318. Accordingly, as Defendants' actions leading to Plaintiff Ramirez Perez's ultimate removal were all contrary to law, Defendants' course of conduct must be set aside and Plaintiff Ramirez Perez must be restored to the status quo before his seizure.

## TENTH CAUSE OF ACTION

Wrongful Deportation Violated the *Accardi* Doctrine in Violation of the Administrative Procedure Act, 5 U.S.C. § 706

*On behalf of Plaintiff Ramirez Perez against Defendants Mullin, Venturella, Brophy, and D'Amato*

319. Mr. Ramirez Perez repeats and realleges the previous factual and jurisdictional allegations in this complaint. Defendants Mullin, Venturella, Brophy, and D'Amato are sued in their official capacities under the APA.

320. "[G]overnment agencies are generally required to follow their own regulations." *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)).

321. Defendants' deportation of Plaintiff Ramirez Perez violated the *Accardi* Doctrine because, in doing so, Defendants violated their own regulations and rules.

322. The course of agency action that directly resulted in Defendants' unlawful deportation of Plaintiff Ramirez Perez—including his unlawful seizure, arrest, detention, and denial of access to counsel—also violated applicable rules, regulations, and laws.

323. Accordingly, as Defendants' actions leading to Plaintiff Ramirez Perez's ultimate removal violated the *Accardi* doctrine, Defendants' course of conduct must be set aside and Plaintiff Ramirez Perez must be restored to the status quo before his seizure.

**ELEVENTH CAUSE OF ACTION**

Wrongful Deportation Was Arbitrary and Capricious in Violation of the Administrative Procedure Act, 5 U.S.C. § 706

*On behalf of Plaintiff Ramirez Perez against Defendants Mullin, Venturella, Brophy, and D'Amato*

324. Mr. Ramirez Perez repeats and realleges the previous factual and jurisdictional allegations in this complaint. Defendants Mullin, Venturella, Brophy, and D'Amato are sued in their official capacities under the APA.

325. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

326. Defendants' deportation of Plaintiff Ramirez Perez was arbitrary and capricious because Defendants failed to articulate a reasoned explanation for their decision to engage in the course of conduct that led to his ultimate deportation, including his seizure, arrest, detention, and summary removal.

327. Accordingly, as Defendants' actions leading to Plaintiff Ramirez Perez's ultimate removal were all arbitrary and capricious, Defendants' course of conduct must be set aside and Plaintiff Ramirez Perez must be restored to the status quo before his seizure.

## TWELFTH CAUSE OF ACTION

Unreasonable Seizure in Violation of the Fourth Amendment

*On behalf of Plaintiff Ramirez Perez against Defendants Mullin, Venturella, Brophy, and D'Amato*

328. Mr. Ramirez Perez repeats and re-alleges the previous factual and jurisdictional allegations in this complaint. Defendants Mullin, Venturella, Brophy, and D'Amato are sued in their official capacities under the Fourth Amendment.

329. As pled above, during the dragnet at NBC, Mr. Ramirez Perez was subject to a suspicion-less seizure and non-consensual questioning in violation of the Fourth Amendment and an arrest without probable cause in violation of the Fourth Amendment, which ultimately led to his unlawful removal.

330. "Having unlawfully seized [Mr. Ramirez Perez] in violation of the Fourth Amendment, which guarantees 'the right of the people to be secure in their persons . . . against unreasonable . . . seizures,' the government should as a matter of fundamental fairness be obligated to return him to his status quo ante." *United States v. Toscanino*, 500 F.2d 267, 275 (2d Cir. 1974), *abrogated on other grounds by In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157, 167 (2d Cir. 2008). In evaluating whether to exercise its power to authorize an equitable remedy for a violation of the Fourth Amendment, courts "must be guided by the underlying principle that the government should be denied the right to exploit its own illegal conduct." *Toscanino*, 500 F.2d at 275.

331. Mr. Ramirez Perez pleads a claim in equity under the Fourth Amendment to restore him to *status quo* prior to his unreasonable seizure on the NBC premises, the last peaceable status

before the pending dispute—that is, the status he occupied prior to his suspicion-less seizure on the morning of September 4, 2025 that began a series of constitutional and statutory violations continuing through his ongoing wrongful deportation.

332. Mr. Ramirez Perez therefore seeks an order placing him in the position he occupied prior to that suspicion-less seizure, that is, at liberty on bond in this judicial district, reunited with his family, and able to continue to pursue his cancellation of removal case to completion, including, if necessary, the opportunity to file from within the United States a petition for review and concurrently to seek a stay of removal from the United States Court for the Second Circuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A. Assume jurisdiction over this matter;

B. Certify the class under Federal Rule of Civil Procedure 23(b)(1) and/or (b)(3), and appoint the undersigned as Class Counsel;

C. Enter a declaratory judgment that the Defendants' seizure and questioning of Plaintiffs violated the United States Constitution, 42 U.S.C. § 1985, the New York State Bivens Act, and *Bivens v. Six Unknown Named Agents*;

D. Enter an order awarding damages to Plaintiffs for the violation of their rights under the United States Constitution, 42 U.S.C. § 1985, the New York State Bivens Act, and *Bivens v. Six Unknown Named Agents*;

E. Declare that the removal of Hediberto Ramirez Perez violated the United States Constitution and the Administrative Procedure Act;

F. Issue a preliminary and permanent injunction (1) ordering Defendants to restore Hediberto Ramirez Perez to the *status quo* before his unlawful seizure and removal by facilitating his return to the United States and, specifically, to the Northern District of New York, where Mr. Ramirez Perez may rejoin his family and continue

to pursue his appeal before the Board of Immigration Appeals and, if necessary, the United States Court of Appeals for the Second Circuit where he will submit a petition for review and motion for stay of removal, and (2) prohibiting Defendants from re-detaining him absent changed circumstances that would provide a lawful basis for re-detention;

G. Award damages in the amount to be determined at trial;

H. Enter an order awarding Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law; and

I. Order such other and further relief as the Court deems equitable, just, and proper.

Respectfully submitted,

**NEW YORK CIVIL LIBERTIES UNION FOUNDATION**
*/s/ Perry Grossman*
Perry Grossman (#702421)
Wafa Junaid (#706888)
Claire Molholm (#706788)
Thomas Munson (#707489)
Molly Biklen (#515729)
125 Broad Street
New York, New York 10004
Phone: (212) 607-3300
pgrossman@nyclu.org
wjunaid@nyclu.org
cmolholm@nyclu.org
tmunson@nyclu.org
mbiklen@nyclu.org

**WORKER JUSTICE CENTER OF NEW YORK**
*/s/ Olivia Post Rich*
Olivia Post Rich (#703805)
Malcolm Kim (#706400)*
1187 Culver Road
Rochester, New York 14609
Phone: 646-545-2211
opostrich@wjcny.org
mkim@wjcny.org

**PAUL TUCK LAW**

*/s/ Paul J. Tuck*
Paul J. Tuck (#520814)
PO Box 44
Manlius, New York 13104
(315) 314-4545
paul@paultucklaw.com

**ARNOLD & PORTER KAYE SCHOLER LLP**

Diana E. Reiter*
Lucy S. McMillan*
Kristine Rose Itliong (#704401)
Alexis Gannaway*
250 West 55th St.
New York, NY 10019
T: (212) 836-8000
F: (212) 836-8689
diana.reiter@arnoldporter.com
lucy.mcmillan@arnoldporter.com
kristine.itliong@arnoldporter.com
alexis.gannaway@arnoldporter.com

Stephanie M. Bonnett**
Gabriela E. Guimaraes Weldon**
601 Massachusetts Ave. NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
stephanie.bonnett@arnoldporter.com
gabriela.guimaraesweldon@arnoldporter.com

*Counsel for Plaintiffs*

*Application for NDNY admission forthcoming.

**Application for *pro hac vice* admission forthcoming.

+We thank María Perales Sánchez of Worker Justice Center of New York, admission pending, for her work on the complaint.

Dated: September 10, 2026