# EXHIBIT 1

**DECLARATION OF HEDIBERTO RAMIREZ-PEREZ**

Hediberto Ramirez-Perez, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am a plaintiff in this case.

2. I am over 18 years of age.

3. I have personal knowledge of all the facts in this declaration.

4. I am originally from Guatemala. I came to the United States in May 2005.

5. I lived in the United States continuously from that time until I was deported to Guatemala on September 7, 2025. I have no criminal record.

6. My home is in Martville, New York, with my wife, Elizabeth Ramirez-Abrams ("Liz"), and our two sons. I have lived in the area of Fulton, New York for about 20 years.

7. Liz and I met in November 2008 when her sister introduced us. We began dating right away.

8. Our sons were born in New York in 2011 and 2012. They are both United States citizens.

9. Liz and I were engaged in June 2014. I proposed to Liz at our home over dinner with the boys at the table.

10. Liz and I have been married since August 23, 2014. Along with the birth of our two sons, our wedding day was one of the happiest days of my life.

11. Liz and I are both critical providers for our family. Until I was deported, we both worked full time at Nutrition Bar Confectioners ("NBC"). I made $21 per hour and Liz made $17 per hour. Both of our incomes were essential to ensuring that our rent was paid, our children had food to eat, and the lights and heat stay on in our home.

12. Liz and I were full partners in everything in our home. We took turns bathing and changing the kids when they were little, and we take turns cooking, cleaning, taking the boys to

doctor's appointments, and all other household tasks. As a father and a husband, I'm proud to do everything I can for my family.

13. We have never had much money, but our family is very rich with love and fun. We love going to nature trails, movies, and Seabreeze amusement park together. We love taking car trips, particularly drives to see waterfalls. Sometimes, I take my boys to the park to play soccer and basketball or to go fishing or on bike rides and let Liz get some time to spend with her sister or to rest.

14. My younger son does everything with me. For example, last summer, I was working on our car and had it lifted up with a jack. My younger son joined me under the car and said he wanted to learn. And so I asked him to identify and hand me different gauges of wrenches and I showed him how I work on our car. He said he wanted to learn more with me and I was proud to be able to teach him.

15. My older son has been diagnosed with anxiety disorder and a learning disability and he has shown symptoms of autism for which he is being evaluated by doctors. He keeps to himself, but when I am home, we usually spend a lot of time together and that helps him.

16. Both of my sons have learning disabilities and individualized education plans at school. As their father, I play a big role in helping them with their schoolwork and particularly with reading. We work through words together and take the time they need. English is not my first language, but I think that my own learning process makes me a better helper for my sons with their learning challenges.

**IMMIGRATION STATUS**

17. In 2018, I was involved in a traffic accident where I was not at fault, but I was detained because of my immigration status. I spent a month detained in Batavia before I was

released on bond. Since 2018, I have had a pending application for cancellation of removal. My case is currently pending before the Board of Immigration appeals ("BIA").

18. I am represented in my immigration case by a local attorney, Jose Perez.

19. While my case has been pending, I have applied for and received authorization to work in the United States.

**MY SEIZURE AT NUTRITION BAR CONFECTIONERS**

20. On September 4, 2025, I was working as a line technician at Nutrition Bar Confectioners in Cato, New York. I liked my job and I was a reliable and valued employee. Before my deportation, I was rarely sick and almost never missed a day of work.

21. I always carried my employment authorization card on me and I had it with me that day.

22. On the morning of September 4, 2025, I arrived at work at NBC and began my shift operating a machine on the packaging line. At some point, a co-worker told me that immigration agents had entered the factory.

23. Agents ordered me and my colleagues to leave our workstations and go to the break room. I complied with the agents' orders. I did not feel free to say no.

24. I arrived at the breakroom and many of my co-workers were there. Agents were stationed at the exits to the breakroom and were both inside and immediately outside the room. I could see that some of the agents had pistols. Some wore masks.

25. At some point, I saw my wife Liz being escorted inside the break room to retrieve her belongings from a locker. She looked upset and scared. We made eye contact and I tried to let her know with my facial expression that everything would be okay, hoping it might settle her

down. She then was escorted outside the break room. That was the last time I saw my wife in-person.

26. Agents ordered everyone to identify themselves as citizens or as non-citizens who were authorized to work. I did not feel free to leave the room or to refuse to comply with the order to identify myself.

27. I approached one of the agents and showed him my employment authorization document. He told me that I should go to the warehouse.

28. In the warehouse, another agent questioned me. I told the agent about my employment authorization document and was going to show it to him. But the agent told me that my employment authorization document meant nothing. I was confused and frightened because I knew I had valid work authorization.

29. A short time later, I approached another group of agents and pleaded that I had a valid employment authorization document and should be free to leave. My pleas were ignored.

30. I attempted to make a phone call to my immigration lawyer, but an agent saw me and demanded that I drop the call. I complied with the agent’s order to drop the call because I did not feel like I had a choice.

31. Another agent approached me with a plastic bag and told me to place my phone and other items in the bag. When I tried to turn off my phone to conserve the battery, another agent yelled at me for using my phone and not following instructions.

32. After other co-workers I was detained with were being led out of the factory, I was being guarded in the hallway by an agent with a long gun. I saw a white co-worker of mine in the hallway and asked if she would call my wife to let her know what happened. When my co-

worker took out her phone, an agent with a long gun commanded her to put it away and she complied with the order.

33. I was taken to another room where I was held alone. A little later, I was taken back into the breakroom where I was held with a group of Latina colleagues. Eventually, I was taken by an agent into the parking lot and told that I was being taken into custody.

34. At no point did agents ask me about my family, my children, or whether I needed to make any arrangements for their care. I was not served with a warrant for my arrest nor was I provided with any paperwork explaining the basis or reasons for my arrest. An agent then drove me to the Oswego Station.

**DETENTION**

35. At Oswego Station, I was placed alone in a small cell. I asked to speak to my family and to my attorney. Agents denied those requests. At Oswego Station, agents gave me papers in English to sign. Although English is not my first language, I am able to read in English somewhat. I read the papers and, to the best of my understanding, they were papers to accept voluntary departure. I refused to sign anything without speaking with my attorney.

36. Later that evening, I was transported to Batavia, where I was placed in a cell with other detained individuals. I had to sleep on the cold, hard floor in a sleeping bag, which didn't provide much comfort and I was not able to get much sleep.

37. While at Batavia, agents presented me with forms written in English and told me to sign them. I read them and understood them to be papers to accept voluntary departure papers. Again, I refused to sign anything without speaking with my attorney.

38. Early the next morning, guards woke me and took me to the airport where they told me they were taking me to Texas. Before boarding the plane, guards placed chains around

my wrists and ankles. I was flown to a border station in McAllen, Texas, arriving at approximately 2:00 p.m. In McAllen, I was placed in a cell with many other men and again had to sleep on the floor.

39. Very early on September 7, 2025, guards woke me and told me to prepare for a deportation flight. This was the first time any government official told me I was being deported. No one explained the legal basis for my removal or gave me any opportunity to challenge it.

40. I was never brought before an immigration judge between the time I first encountered agents at the factory on September 4, 2025 and the time I was deported on September 7, 2025. During that time, I was also not able to speak to my attorney.

41. While at McAllen, I was told that I would be able to make a five minute phone call specifically to call my family. I called my wife. She had not seen or heard from me since I saw her at the factory. Agents cut off the call after only two minutes. I asked agents if I could call my attorney, but I was told I would not be able to call my attorney until Monday. I was deported on Sunday morning.

42. Early in the morning on September 7, 2025, agents shackled my wrists and ankles and placed me on a deportation flight to Guatemala City. I had not been to Guatemala for over twenty years.

43. I do not have a final order of removal.

44. I did not sign any voluntary departure papers.

**CURRENT SITUATION**

45. I am currently in Huehuetenango, Guatemala.

46. My family and I have struggled since my deportation.

47. My deportation has caused our family to lose over half of our household income. I know Liz is working as much overtime as she can, but there are limits to how much income she

can make up because I am not there to help with all of the caregiving, cooking, cleaning, taking the boys to doctor's appointments, or other household tasks.

48. My older son's psychological health issues have gotten worse since we have been unable to spend time together. We talk as much as possible, but he otherwise keeps to himself more than ever. I want to get back to my family to help support him with his condition as much as possible.

49. My younger son and I used to do everything together. Since I was taken away, he has been telling people that the government took his best friend. I think about that every day.

50. My wife, Liz, is a great person who has struggled with mental health issues and learning disabilities. I love my wife very much and I have been proud to support her through her challenges. I know that my being taken from her has caused Liz tremendous sadness and anxiety.

51. I speak to my family every day, although the phone and internet service here are not always reliable. I can see that my family is suffering without me. I know that Liz is working as hard as she can to hold the family together alone.

52. I worry about Liz and my sons all the time because my wife is working full-time to support our family economically while taking care of both of our boys on her own and fighting with her own mental health challenges.

53. The stress of being separated from my family is causing me physical hardship. I have difficulty sleeping and have little appetite. I have lost forty-five pounds since I was first detained.

54. I am ready and willing to return to the United States immediately. My BIA appeal remains pending. And if my BIA appeal is unsuccessful, I will file a petition for review with the

United States Court of Appeals for the Second Circuit and seek a stay of removal while the petition for review is pending.

55. I want to come home to my family, to be able to take care of my children, and to support Liz, who has supported me and our boys so much while I have been deported.

56. There is nothing that can substitute for being at home with my wife and my sons.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on 8/9 ______, 2026, in Huehuetenango, Guatemala.

[signature]

Hediberto Ramirez-Perez